**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

No. 00-30530
No. 00-31118

CATHRYN GREEN,                                    Plaintiff-Appellant-Cross-Appellee,

versus

THE ADMINISTRATORS OF THE TULANE
EDUCATIONAL FUND,                          Defendant-Appellee-Cross-
                                                             Appellant.

CATHRYN GREEN,                                    Plaintiff - Appellee,

versus

THE ADMINISTRATORS OF THE TULANE
EDUCATIONAL FUND, ET AL.,

                                                             Defendants,

THE ADMINISTRATORS OF THE TULANE
EDUCATIONAL FUND,                          Defendant - Appellant.

Appeals from the United States District Court
for the Eastern District of Louisiana

March 15, 2002

Before HIGGINBOTHAM, BARKSDALE, and STEWART, Circuit Judges.

CARL E. STEWART, Circuit Judge:

Cathryn Green ("Green") alleges that, following a failed consensual relationship with Dr. Donald Richardson ("Richardson"), her supervisor and the Chairman of the Department of Neurosurgery at Tulane University ("Tulane"), Richardson harassed her because she refused to continue having a casual sexual relationship with him. Green filed suit against Richardson and Tulane, alleging sexual harassment and retaliation claims under Title VII and other causes of action under Louisiana law. Green sought compensatory damages, back pay, front pay, and punitive damages.

The district court granted a partial summary judgment motion dismissing all of Green's claims against Richardson and her intentional infliction of emotional distress and respondeat superior claims against Tulane. At the close of the evidence, the district court granted Tulane's motion for judgment as a matter of law, holding that Green was not entitled to punitive damages. The jury returned a verdict in favor of Green and awarded her $300,000 in compensatory damages. The court affirmed the advisory jury's back pay award of $124,673 and awarded $4,287 in front pay. Final judgment was entered on December 8, 1999. On March 30, 2000, the court denied Tulane's post-judgment Rule 50 motion and its motion for a new trial regarding the jury verdict. On August 8, 2000, the district court entered a judgment awarding $302,285 in attorneys' fees. Thereafter, on August 18, 2000, the Clerk of Court taxed costs in the amount of $28,929.29. On October 11, 2000, the district court awarded an additional $98 in costs.

In this appeal, Green challenges the district court's grant of judgment as a matter of law, which dismissed her claim for punitive damages. Tulane appeals the court's denial of its motion for judgment as a matter of law, arguing that the court erred in several ways. Tulane submits that the harassment endured by Green was not sufficiently severe or pervasive. Moreover, Tulane argues that

harassment arising out of personal animosity is not based on sex and is, therefore, not actionable under Title VII. Tulane further asserts that Green suffered no tangible employment action. It also maintains that the alleged retaliatory actions took place before Green complained of the harassment, and thus, there was no causal connection between Green's engaging in protected activity and the actions taken against her. Tulane further argues that the court's award of front pay, back pay, and attorneys' fees amounted to an abuse of discretion. It further asserts that the trial court improperly instructed the jury and incorrectly admitted prejudicial hearsay testimony. We AFFIRM the district court's judgment in all respects.

I.

Green was first employed as a secretary to Richardson in May of 1972. After a few years, she left Tulane; however, in April of 1980, she returned as an "Administrative Assistant IV." Green eventually took the position of "Office Manager." In the years prior to Green's sexual involvement with Richardson, she was never reprimanded for her job performance. In fact, it appears that she was considered a stellar employee.

Since 1972, Richardson pursued Green romantically. In 1991, he began to pursue her more intensely. By October of 1992, a consensual sexual relationship commenced. However, the relationship was on-again/off-again and was ultimately terminated in November of 1993. The impetus for their break-up appears to have been Richardson's resumption of a prior relationship with Julie Frentz ("Frentz"). Shortly thereafter, Green underwent a hysterectomy. During the procedure, she experienced severe complications causing her to be absent from work for an extended period of time.

In January of 1994, Green began to work on an as-tolerated basis. It was at this time that Richardson allegedly began to sexually harass her. He directed that the locks on her desk be broken

3

and that her drawers be searched. Green contends that Frentz wanted her fired, and that at Frentz's behest, Richardson undertook a campaign to make it impossible for her to continue performing her job duties.

In mid-January of 1994, Green took further time off to recuperate. Despite Richardson's assurances that Green could take all the time she needed to recover, he sent her a certified letter stating that she must return to work on the next business day or supply a doctor's note. Green received the letter on January 14th, the Friday before a holiday weekend and was therefore unable to secure a doctor's note. As such, she returned to work on the next business day, which was January 18th. On the same day, she went to the head of Tulane's personnel department, Frank Currie ("Currie"), to lodge a complaint against Richardson. She also replied to Richardson's letter by drafting a response defending herself. She carbon copied Currie in that letter, thereby putting Richardson on notice that she had alerted the personnel department about his behavior.

On January 20th, Richardson filled out a Staff Counseling Report ("SCR"), wherein he listed Green's job title as Administrative Assistant rather than Office Manager. The SCR delegated many of Green's duties to Richardson. She was also accused of being verbally abusive to office personnel. Green again contacted Currie, who placed her on Paid Administrative Leave ("PAL"), and instructed that she return on January 24th. Currie later informed Richardson that the SCR was against Tulane policy and would be withdrawn and retracted.

Green maintains that despite revisions to the SCR, her job duties were never restored. Moreover, she maintains that, on February 8th, she overheard a staff meeting wherein Richardson and Frentz "plotted" to reorganize the department in such a manner that stripped Green of her remaining

4

job responsibilities.[1] Two days later, Green met with Mary Smith ("Smith"), Tulane's EEO officer. On February 16th, Green made a formal complaint with the EEO office. Green was subsequently placed on PAL again.

In late February, Smith held a meeting with Richardson and Green wherein Smith reinstated all of Green's job duties. Green maintains that despite Smith's instructions, her duties were still not restored. Richardson continued to alter her job duties and Green continued to complain to Smith and Currie. She was placed on PAL again.

Upon the exhaustion of available PAL, Currie sent Green a letter stating that she had to return to work on April 11, 1994. On April 11, 1994, Green informed Currie that she could no longer work with Richardson as it was having a deleterious effect on her mental health. Green took this step at the direction of Dr. George N. Guild ("Guild"), her psychotherapist. Guild had advised her that she should no longer work for Richardson as she was experiencing suicidal ideation. Guild also diagnosed her with mood and anxiety disorders. He testified that the experience with Richardson caused Green to relive the trauma she had experienced during an earlier rape, which in turn brought on a relapse of Post-traumatic Stress Disorder ("PTSD").[2]

Subsequently, Green applied for long-term disability due to her deteriorating mental condition. While on PAL, she received her full salary. Ultimately, Green was on PAL through July 1, 1994, when she began receiving disability payments. Tulane maintains that it began seeking an appropriate transfer for Green in March and that it continued to do so throughout this time. Green interviewed

---

[1] Green notified Currie about the meeting. Currie ultimately reprimanded Richardson for having Frentz conduct departmental business.

[2] In 1988, Green was stalked, raped, stabbed, and robbed in her home by a man who had previously raped her daughter. She was subsequently diagnosed with PTSD.

5

for one other position within the Tulane system, but she was not given the job. At the direction of Guild, Green subsequently began attending nursing school. She began working as a nurse full time in 1998.

## II.

Green first argues that, since the entry of judgment occurred on December 8, 1999, Tulane's Notice of Appeal, which was filed on April 28, 2000, is untimely as it was filed after the thirty-day period allowed by FED. R. APP. P. 4(a)(1)(A). Tulane responds that it delivered its Rule 50(b) motion for judgment as a matter of law to the clerk of the district court on December 22, 1999, within the requisite ten day period set by the Rule, as computed by FED. R. CIV. P. 6(a). It argues that it timely filed its motions when they were hand delivered to the clerk, even though the clerk stamped as "filed" only the motion for leave to file the supporting memoranda in excess of twenty-five pages, and thereafter stamped the post-judgment motion filed on January 3, 2000.

FED. R. APP. P. 4(a)(4)(A)(i) provides that if a party timely files its Rule 50(b) motion, the time to file an appeal does not run until the entry of the order disposing of that motion. The Rule 50(b) motion was disposed of on March 30, 2000, thereby making Tulane's April 28, 2000 notice of appeal timely, since it delivered the motion to the clerk on December 22, 2000.[3] Tulane is not liable for the clerk's failure to stamp the motion "filed" until January 3, 2000. Hernandez v. Aldridge, 902 F.2d 386, 388 (5th Cir. 1990).

## III.

---

[3] Tulane has provided this Court with an affidavit confirming that it filed its motion for judgment as a matter of law on December 22, 2000.

6

We review *de novo* a district court's grant or denial of a motion for judgment as a matter of law. Stokes v. Emerson Elec. Co., 217 F.3d 353, 356 (5th Cir. 2000); Price v. Marathon Cheese Corp., 119 F.3d 330, 333 (5th Cir. 1997). Judgment as a matter of law is appropriate if "there is no legally sufficient evidentiary basis for a reasonable jury to find for [a] party on [an] issue." FED. R. CIV. P. 50(a). Reviewing all of the evidence in the record, a "court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). In so doing, the court "must disregard all evidence favorable to the moving party that the jury is not required to believe." Reeves, 530 U.S. at 151.

At the outset, we note that the instant action was tried by a jury and that it is the function of the jury to weigh evidence. Treadaway v. Societe Anonyme Louis-Dreyfus, 894 F.2d 161, 164 (5th Cir. 1990). Attributing weight to conflicting evidence and drawing inferences from such evidence are within the province of the jury and its decision should be given deference if the record contains any competent evidence to support its findings. Gibralter Sav. v. LDBrinkman Corp., 860 F.2d 1275, 1297 (5th Cir. 1988). We have found that the evidence in the record can support a jury verdict if it is "of such quality and weight that reasonable and fair-minded [individuals] in the exercise of impartial judgment might reach different conclusions." Transoil (Jersey) Ltd. v. Belcher Oil Co., 950 F.2d 1115, 1118 (5th Cir. 1992). It is with these precepts in mind that we address the majority of the issues involved in Tulane's appeal. However, we first turn to Green's appeal regarding punitive damages, an issue which did not reach the jury.

7

IV.

Green contends that the district court erred in granting Tulane's motion for judgment as a matter of law on her punitive damages claim. An employer is liable for punitive damages in a Title VII action if (1) its agent is employed in a position of managerial capacity, (2) the agent acts within the scope of employment, and (3) the agent acts with malice or reckless indifference towards the federally protected rights of the plaintiff. Kolstad v. Am. Dental Ass'n, 527 U.S. 526, 535-45 (1999). However, such liability may not be imputed if the agent's actions are contrary to the employer's good faith effort to comply with Title VII. Id. at 545.

A.

The district court found that Richardson was an agent under the Kolstad framework and that he acted within the scope of his employment. However, the court did not determine whether there was sufficient evidence for a jury to find that Richardson acted with malice or reckless indifference. Instead, the court determined that no reasonable juror could conclude that Tulane did not act in good faith. We need not address the three-prong test set forth in Kolstad as we agree with the district court's determination that Tulane made a good faith effort to comply with Title VII.

In Deffenbaugh-Williams v. Wal-Mart Stores, Inc., Wal-Mart failed to put forth any evidence of its good faith efforts with the exception of its statement that it "encourages employees to contact higher management with grievances." 188 F.3d 278, 286 (5th Cir. 1999). Moreover, on the specific facts of the case, Wal-Mart failed to show any response to Deffenbaugh's complaint or any specific efforts to comply with Title VII. Id. As such, we concluded that Wal-Mart's evidence that it acted in good faith was "certainly not so overwhelming that reasonable jurors could not conclude otherwise." Id.; see also Hertberg v. SRAM Corp., 261 F.3d 651, 664 (7th Cir. 2001) (holding that

8

a jury was entitled to conclude that an employer did not act in good faith where employer responded to complaints of sexual harassment by telling the complainant she was just "too emotional"); Cadena v. Pacesetter Corp., 224 F.3d 1203, 1210 (10th Cir. 2000) (refusing to enter judgment as a matter of law regarding good faith where the employer failed to take *any* action to put an end to sexual harassment).

In contrast, in the instant action, there is evidence to support the good faith ruling. Although Tulane failed to adequately reprimand Richardson or to reinstate Green's duties, this does not establish that Tulane did not act in good faith. It only illustrates that Tulane did not resolve the problem in a completely satisfactory manner. First, we note that Tulane's Staff Handbook contains a written policy prohibiting sexual harassment. This alone, nevertheless, would not be enough if Tulane failed to enforce its policy. Kolstad, 527 U.S. at 546. However, Tulane made a good faith effort by placing Green on PAL, holding several meetings, and directing Richardson to rewrite the SCR and to reinstate Green's duties. Moreover, Tulane informed Richardson that his SCR was inappropriate, as was his allowing Frentz to handle departmental business. As such, we conclude that under the circumstances of this case, the district court's ruling of good faith on the part of Tulane was not error.

V.

Tulane argues that Green did not demonstrate that a tangible employment action occurred. As such, it concludes that it is entitled to the affirmative defense set forth in the companion cases of Faragher v. City of Boca Raton, 524 U.S. 775, 805 (1998), and Burlington Indus., Inc. v. Ellerth, 524

9

U.S. 742, 765 (1998).[4]  Tulane maintains that a "tangible employment action in most cases inflicts direct economic harm."  Ellerth, 524 U.S. at 762.  It concludes that since Green's demotion did not inflict economic harm, it cannot be a tangible employment action.

While Tulane is correct that Ellerth acknowledged that in most cases a tangible employment action inflicts economic harm, the Supreme Court did not state that loss of an economic benefit was required in all cases.  Moreover, Ellerth cites with approval the Sixth Circuit's decision in Kocsis v. Multi-Care Mgmt., Inc., 97 F.3d 876 (6th Cir. 1996), wherein the court held that a demotion *without* a change in pay, benefits, duties, or prestige was sufficient.  Ellerth, 524 U.S. at 761 (citing Kocsis, 97 F.3d at 887).  Thus, we find that Green's demotion alone was sufficient to constitute a tangible employment action.  Once a tangible employment action has been found, an employer is not entitled to the Faragher/Ellerth defense.  Therefore, we do not need to address Tulane's contentions with regard to the affirmative defense.[5]

---

[4]  The affirmative defense set forth in Faragher and Ellerth is comprised of two necessary elements: "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."  Faragher, 524 U.S. at 805; Ellerth, 524 U.S. at 765.

[5]  We are not persuaded by Tulane's argument that because this action was tried as a hostile work environment case, it is entitled to the Faragher/Ellerth defense under Casiano v. AT&T Corp., 213 F.3d 278 (5th Cir. 2000).  Casiano provides that if a tangible employment action is taken, a case is normally characterized as a quid pro quo claim and the Faragher/Ellerth defense is not applicable.  213 F.3d at 283-84.  Casiano also states that if no tangible employment action is taken, a case is viewed as a hostile environment claim, and the Faragher/Ellerth defense is available. Id. at 284.  However, Casiano does not address the situation presented in the instant action.  Before us today, we have a case that was tried as a hostile work environment claim but a tangible employment action was proven.  We conclude that, in such a case, a defendant is not entitled to the Faragher/Ellerth defense.  In Ellerth, the Supreme Court noted that the terms quid pro quo and hostile work environment, while helpful, are not dispositive.  Ellerth, 425 U.S. at 751.  Instead, the Court focused on when an employer should be held vicariously liable for the actions of its supervisory employee.  Id. at 753-54.  The Court found that when a plaintiff proves a tangible employment action, a change in the terms or conditions of employment has been established.  Id.  It further concluded that when such an action occurs, there is assurance that the injury could not have been inflicted absent an agency relation.  Id. at 761-62.  Finally, the Court held that a tangible employment action becomes the act of an employer under Title VII.  Id. at 762.  No affirmative defense is available under these circumstances.  Id. at 762, 765.  Thus, regardless of which theory this case was tried as, since a tangible employment action was suffered, agency principles are satisfied, and Tulane is not entitled to the defense.

10

VI.

Tulane argues that Green did not provide sufficient evidence to support a hostile work environment claim. The plaintiff in a hostile work environment claim must establish that: (1) she belongs to a protected class, (2) she was subjected to unwelcome sexual harassment, (3) the harassment was based on sex, (4) the harassment affected a term, condition, or privilege of employment, and (5) the employer knew or should have known of the harassment and failed to take remedial action. Mota v. Univ. of Tex. Houston Health Science Ctr., 261 F.3d 512, 523 (5th Cir. 2001). Tulane contends that Richardson's harassment of Green was not sufficiently severe or pervasive so as to affect the terms or conditions of her employment. It also asserts that the harassment endured by Green was not based on sex.

A.

Conduct sufficient to create a hostile working environment must be severe or pervasive. Ellerth, 524 U.S. at 752. In order to state a cause of action under Title VII, a sexually objectionable environment must be both subjectively and objectively offensive. Shepherd v. Comptroller of Public Accounts of Tex., 168 F.3d 871, 874 (5th Cir. 1999). "Whether an environment is hostile or abusive depends on a totality of circumstances, focusing on factors such as the frequency of the conduct, the severity of the conduct, the degree to which the conduct is physically threatening or humiliating, and the degree to which the conduct unreasonably interferes with an employee's work performance." Weller v. Citation Oil & Gas Corp., 84 F.3d 191, 194 (5th Cir. 1996).

A rational jury could find that Richardson's conduct was sufficiently severe or pervasive to create a hostile work environment. The evidence supports a finding that Richardson's actions interfered with Green's work performance, that he reprimanded and demoted her, and that he cursed

11

at and humiliated her. Moreover, the record suggests that Green suffered severe psychological effects as a result of the harassment. It is true that Dr. Guild testified that it was difficult to attribute Green's psychological problems to a single cause in light of the trauma experienced by her. However, a jury could have rationally concluded that Richardson's actions, especially in light of his knowledge of Green's fragile psychological history, were severe and pervasive, and were causally related to her emotional distress. Further, the record supports the conclusion that the harassment endured by Green forced her to leave a job which she enjoyed in order to protect her mental health. As such, we find that there was sufficient evidence to support the jury's finding of severe or pervasive conduct.

B.

Tulane further argues that the harassment endured by Green was not based on sex. It maintains that personal animosity following a failed sexual relationship does not constitute sexual harassment. In support of its argument, Tulane relies primarily on the reasoning in Succar v. Dade County Board, 229 F.3d 1343 (11th Cir. 2000). In Succar, the Eleventh Circuit found that a female employee's harassment of a male employee was not harassment based upon sex, as the defendant's actions were "not the result of [the] [p]laintiff's gender but of responses to an individual because of her former intimate place in [that individual's] life." Id. at 1345 (internal quotations and citations omitted).

In support of its position, Tulane asserts that Richardson never exerted any pressure on Green to resume the relationship after it ended in November of 1993. Tulane argues that Richardson's conduct toward Green was not premised upon the fact that she is a woman. Moreover, it argues that the harassment Green claims to have endured was not sexual in nature. Tulane maintains that, at

12

most, Green proved no more than personal animosity arising out of the failed relationship between herself and Richardson.[6]

The district court found that the flaw in Tulane's analysis was illustrated by reviewing <u>Oncale v. Sundowner Offshore Serv., Inc.</u>, 523 U.S. 75, 79-80 (1998). In <u>Oncale</u>, the Supreme Court stated, "Title VII prohibits discriminat[ion] . . . because of . . . sex in the terms or conditions of employment. Our holding that this includes sexual harassment must extend to sexual harassment of any kind that meets the statutory requirements." <u>Oncale</u>, 523 U.S. at 79-80 (internal quotations omitted). Thus, the district court determined that the critical issue, in the Title VII context, is whether Green was exposed to disadvantageous terms or conditions of employment to which members of the opposite sex were not.

We agree with the district court and conclude that there is sufficient evidence supporting the jury's finding that Richardson's actions were causally related to Green's gender. For example, Irene Nero ("Nero"), the manager of the clinical side of the Department of Neurology, testified that Richardson had hopes of marrying Green one day, but that Green was more reticent about the idea. Moreover, Green testified that she did not want a casual sexual relationship with Richardson and that the resumption of his relationship with his ex-girlfriend disrupted the possibility of a continued serious relationship. In any event, it was only after the relationship ended that Richardson began to harass

---

[6] In this regard, Tulane also argues that Green's evidence was insufficient to overcome the jurisprudence established in the "paramour cases." In these types of cases, courts have held that when an employer discriminates in favor of a paramour, such an action is not sex-based discrimination, as the favoritism, while unfair, disadvantages both sexes alike for reasons other than gender. <u>E.g.</u>, <u>Womack v. Runyon</u>, 147 F.3d 1298, 1300 (11th Cir. 1998); <u>DeCintio v. Westchester County Med. Ctr.</u>, 807 F.3d 304, 308 (2d Cir. 1986). The paramour cases are inapposite. In <u>Womack</u> and <u>DeCintio</u>, the non-paramours were all treated equally unfairly. <u>Womack</u>, 147 F.3d at 1300-01; <u>DeCintio</u>, 807 F.3d at 308. The record shows that Richardson did not discriminate against everyone in favor of Frentz. His actions were directed solely at Green.

her. This fact alone supports a jury's inference that he harassed her because she refused to continue to have a casual sexual relationship with him. As such, we conclude that there was sufficient evidence to support the jury's finding of sexual harassment.

## VII.

Tulane contends that the district court erred in denying its motion for judgment as a matter of law on Green's Title VII retaliation claim. To state a claim for retaliation, Green was required to establish that: (1) she engaged in protected activity, (2) she suffered an adverse employment action, and (3) a causal nexus existed between the protected activity and the adverse employment action. Mota, 261 F.3d at 519. Protected activity is defined as opposition to any practice rendered unlawful by Title VII, including making a charge, testifying, assisting, or participating in any investigation, proceeding, or hearing under Title VII. 42 U.S.C. § 2000e-3(a) (2001). Adverse employment actions include only ultimate employment decisions such as hiring, granting leave, discharging, promoting, or compensating. Walker v. Thompson, 214 F.3d 615, 629 (5th Cir. 2000). To demonstrate causation, an employee must show that "but for" the protected activity, the adverse employment action would not have taken place. Seaman v. CSPH, Inc., 179 F.3d 297, 301 (5th Cir. 1999).

## A.

Tulane argues that Green did not establish that she engaged in a protected activity. Tulane essentially rehashes its earlier argument that the conduct Green complained about to Smith and Currie was not sex discrimination but retaliation resulting from a failed relationship. As such, Tulane asserts that the act of making the complaints was not protected by Title VII.

14

This argument is meritless. Title VII does not require that a plaintiff prove that the conduct opposed was actually in violation of Title VII, but only that a charge was made, or that participation in an investigation of a violation of Title VII occurred. Here, Green reasonably believed that she was in the process of being terminated due to her sex and lodged a complaint based on this belief. We find this legally sufficient for a claim of retaliation. See Payne v. McLemore's Wholesale & Retail Stores, 654 F.2d 1130, 1137 (5th Cir. 1981).

B.

Tulane asserts that changing locks, restructuring office procedures, clarifying job duties, and taking disciplinary actions in the form of reprimands, do not constitute ultimate employment decisions. Tulane is correct; however, the record supports the view that Green was demoted from Office Manager to an Administrative Assistant IV, and that although her job duties were verbally restored, in practice she never regained them. As such, Green suffered an adverse employment action. See Southard v. Tex. Bd. Crim. Justice, 114 F.3d 539, 555 (5th Cir. 1997) (recognizing that a demotion constitutes an adverse employment action).

C.

Tulane next argues that Green failed to establish a causal connection between the adverse employment action and Green's engaging in protected activity. It maintains that nearly all of the complained of actions occurred before she lodged a complaint with Smith on February 16th.

This argument is also without merit. It is irrelevant that she did not formally complain to Smith until February 16th, as she had been complaining to personnel since January 18th. Richardson testified that he knew that Green had visited with Currie and that she had voiced concerns regarding his inappropriate behavior. It was after Richardson learned about Green's complaints to Currie that

15

he drafted the January 20th SCR, which removed substantially all of Green's duties and demoted her. We find that there was sufficient evidence in the record to support a causal connection between Green's engaging in protected activity and her demotion.

## VIII.

Tulane contends that the court's award of front pay constituted an abuse of discretion.[7]  See Shirley v. Chrysler First, Inc., 970 F.2d 39, 44 (5th Cir. 1992) (applying an abuse of discretion standard to court's award of front pay).  Front pay is a form of equitable relief contemplated by Title VII and is intended "to compensate the plaintiff for lost future wages and benefits." Mota, 261 F.3d at 526 (quoting Shirley, 970 F.2d at 44).  "[F]ront pay may be awarded if reinstatement is not feasible" because a hostile relationship exists between the employer and the plaintiff. Woodhouse v. Magnolia Hosp, 92 F.3d 248, 257-58 (5th Cir. 1996).  The district court awarded Green $4,287 in front pay after it determined that reinstatement was not feasible in this case due to the discord between the parties.  The court considered the fact that Green obtained a job with a better salary, thereby mitigating her damages, and awarded front pay based on a scenario postulated by Tulane's own expert.  Based on these factors, we find that the district court did not abuse its discretion.

## IX.

Tulane also submits that the district court's award of back pay was an abuse of discretion. It argues that a Title VII litigant has a duty to minimize damages by using reasonable diligence to find other suitable employment. Ford Motor Co. v. EEOC, 458 U.S. 219, 231 (1982).  Tulane asserts

---

[7]  Tulane also maintains that front pay is an element of compensatory damages.  Since Green received the statutory cap in compensatory damages, Tulane argues that she may not be awarded front pay.  We disagree. See Pollard v. E.I. du Pont de Nemours & Co., 121 S. Ct. 1946, 1948 (2001) (finding that front pay is not an element of compensatory damages under the Civil Rights Act of 1991).

16

that Green did not mitigate her damages and is therefore not entitled to back pay. It maintains that Green's job remained available to her, yet she chose disability. Moreover, Tulane argues that Green voluntarily left the job market by choosing to attend nursing school. Tulane relies on Floca, a front pay case, where we favorably cited the Tenth Circuit decision in Taylor. See Floca v. Homecare Health Servs., Inc., 845 F.2d 108, 112-13 (5th Cir. 1988). In Taylor, the court stated that "when an employee opts to attend school, curtailing present earning capacity in order to reap greater future earnings, a back pay award for the period while attending school . . . would be like receiving a double benefit." Taylor v. Safeway Stores, Inc., 524 F.2d 263, 268 (10th Cir. 1975).

Back pay is intended to compensate the victim for economic losses sustained as a result of the Title VII injury. We recognize that Floca may lend some support to Tulane's position. However, we note that the jury was instructed on the duty to mitigate. The jury found that Green had been constructively discharged and the court awarded back pay based on this finding. The district court properly noted that in light of Green's mental state, and her subsequent mitigation of the front pay award by obtaining a degree and a higher paying job, there was sufficient evidence to warrant an award of back pay. The district court did not abuse its discretion.

## X.

Tulane next contends that the trial judge allegedly committed a panoply of errors, which it asserts warrant a new trial. First, it argues that the district court improperly failed to give its requested jury instructions regarding sex-neutral hostile conduct. Second, it maintains that the trial judge improperly admitted highly prejudicial hearsay evidence. Finally, it contends that the district court improperly admitted evidence of other sexual harassment complaints against Richardson.

17

## A.

Tulane argues that over its objection, the district court failed to charge the jury that sex-neutral hostile conduct cannot support a hostile environment claim. Tulane asserts that this error caused the jury to lack sufficient guidance and tainted the verdict, thereby entitling Tulane to a new trial.

Our standard of review for challenged jury instructions is well-settled. First, the challenger must demonstrate that the charge creates substantial doubt as to whether the jury was properly guided in its deliberations. Hartsell v. Dr. Pepper Bottling Co., 207 F.3d 269, 273 (5th Cir. 2000). Second, even if the jury instructions were erroneous, we will not reverse if we determine, based upon the entire record, that the challenged instruction could not have affected the outcome of the case. Id.

The jury was instructed that harassment creating a hostile work environment on the *basis of gender* is a form of discrimination prohibited by Title VII. The court also instructed the jury that it needed to find that Green's gender was the *but for* reason for Richardson's conduct. In light of this, the court clearly did not abuse its discretion. In fact, we note that the jury instructions given by the court indirectly state what Tulane sought, namely, that the harassment could not be sex neutral but must be based on sex.

## B.

Tulane argues that the district court improperly allowed Nero to testify about a statement made by Richardson that Frentz gave him an ultimatum to "get rid of Green" or else she would not marry him. Tulane asserts that the statement was hearsay within hearsay and that no double exception was applicable.

We apply an abuse of discretion standard when reviewing evidentiary rulings. Jon-T Chems., Inc. v. Freeport Chem. Co., 704 F.2d 1412, 1417 (5th Cir. 1983). If an abuse of discretion is found, the harmless error doctrine is applied. United States v. Skipper, 74 F.3d 608, 612 (5th Cir. 1996). Thus, evidentiary rulings are affirmed unless the district court abused its discretion and a substantial right of the complaining party was affected. United States v. Asibor, 109 F.3d 1023, 1032 (5th Cir. 1997).

The statement testified to by Nero was not double hearsay because she did not testify about Frentz's statement. Nero only testified that Richardson told her that "*he* had to get rid of Green." Consequently, the district court admitted the statement at issue as the statement of Richardson, a party opponent. FED. R. EVID. 801(d)(2). Thus, we find that there was no abuse of discretion by the district court.

## C.

Tulane contends that Nero's testimony about three other complaints of sexual harassment against Richardson was inadmissible hearsay, which tainted the validity of the trial. It asserts that the court's limiting instruction, that the testimony was not being admitted for the truth of the matter asserted, was not sufficient to cure the taint resulting from admission of this evidence.

The district court's ruling on this statement was correct because the court did not let the statement in for the truth of the matter asserted, that Richardson harassed other women, but to prove that Tulane was on notice that Richardson might have been sexually harassing women. As such, we find no abuse of discretion.

19

XI.

Tulane argues that the damages awarded by the jury were an attempt to compensate Green for all her "past woes" and that the jury acted out of passion. Thus, it asserts that we should grant a remittitur of the compensatory damage and back pay awards.

Tulane further contends that it is entitled to an offset for the disability benefits received by Green and against the back pay award for the settlement it paid in her workers' compensation suit. Tulane asserts that the Receipt and Release provided that it would be entitled to deduct the full settlement amount "from any recovery against Tulane to which she may become entitled by judgment or settlement in litigation" of her lawsuit, then pending in state court.

In reviewing a jury award, we are reviewing the district court's denial of a motion for a new trial or remittitur. Concise Oil & Gas P'ship v. La. Intrastate Gas Corp., 986 F.2d 1463, 1475 (5th Cir. 1993). Because the district court has a wide range of discretion in acting on such motions, the standard of review is abuse of discretion. Sam's Style Shop v. Cosmos Broad. Corp., 694 F.2d 998, 1006 (5th Cir. 1982). "[T]here is no such abuse of discretion unless there is a complete absence of evidence to support the verdict." Id. A jury award is entitled to great deference and should not be disturbed unless it is entirely disproportionate to the injury sustained. Caldarera v. Eastern Airlines, Inc., 705 F.2d 778, 784 (5th Cir. 1983).

The district court found that the verdict was not patently unreasonable or against the great weight of the evidence. We agree. As the district court noted, it would be improper to speculate about the nature of the jury deliberations, especially in light of the fact that there was no reason to suspect that the jury acted out of passion or prejudice.

20

Further, the collateral source rule provides that disability insurance purchased by the plaintiff cannot reduce a recovery. Phillips v. Western Co. of N.A., 953 F.2d 923, 930 (5th Cir. 1992). Since Green's insurance benefits were obtained from a policy which she paid for out of her personal funds, it is a collateral source and should not be deducted from her recovery. With regard to the workers' compensation payment, the Receipt and Release was not offered into evidence and therefore may not be considered when determining whether to reduce the damages award.

XII.

Tulane contends that the award of attorneys' fees was flawed in numerous respects. First, Tulane argues that the magistrate judge did not make an across the board percentage cut to compensate for its finding that Green's counsel failed to exercise billing judgment. Second, it maintains that Green was improperly awarded fees for work performed in connection with her workers' compensation and state law suits. Third, Tulane argues that the hourly rates determined by the judge are inappropriate. Finally, it asserts various errors in the judge's determination of whether a deduction to the lodestar was warranted.

To calculate attorneys' fees, a court must first "calculate a lodestar fee by multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate." Rutherford v. Harris County, Tex., 197 F.3d 173, 192 (5th Cir. 1999). Next, the court must consider whether the lodestar should be adjusted upward or downward, depending on the circumstances of the case, and the factors set forth in Johnson v. Ga. Highway Express, Inc., 488 F.2d 714 (5th Cir. 1974). The Johnson factors are: (1) the time and labor required to litigate the matter; (2) the novelty and complicatedness of the issues; (3) the skill required to properly litigate the issues; (4) whether the attorney had to refuse other work to litigate the case; (5) the attorney's customary fee; (6) whether

21

the fee is fixed or contingent; (7) whether the client or case imposed time constraints; (8) the amount involved and results obtained; (9) the experience, reputation, and ability of the attorney; (10) whether the case was "undesirable"; (11) the type of attorney-client relationship and whether the relationship was long-standing; and (12) awards made in similar cases. Id. at 717-19. To the extent that any Johnson factors are subsumed in the lodestar, they should not be reconsidered when determining whether an adjustment to the lodestar is required. Migis v. Pearle Vision, Inc., 135 F.3d 1041, 1047 (5th Cir. 1998).

We review the grant of attorneys' fees under two separate standards. The district court's initial determination of the lodestar amount is reviewed for clear error. Migis, 135 F.3d at 1047. However, the district court's application of the Johnson factors is reviewed for an abuse of discretion. Id. The "'district court's [Johnson] analysis . . . need not be meticulously detailed to survive appellate review,' but it must articulate and clearly apply the Johnson criteria." Riley v. City of Jackson, Miss., 99 F.3d 757, 759 (5th Cir. 1996) (quoting La. Power & Light Co. v. Kellstrom, 50 F.3d 319, 331 (5th Cir. 1995)).

## A.

Tulane contends that Green offered woefully inadequate evidence to show that billing judgment was exercised. It argues that Green's contention that hours were written off before submitting the bills to the magistrate judge was disingenuous. It further asserts that the district court incorrectly combined the reduction applicable for non-compensable time with the reduction mandated for failure to exercise billing judgment.

To determine the number of hours reasonably expended on a case, a plaintiff must show that billing judgment was exercised. Walker v. HUD, 99 F.3d 761, 769 (5th Cir. 1996). Billing judgment

22

is usually shown by the attorney writing off unproductive, excessive, or redundant hours.  Id.  We have held that the remedy for failing to exercise billing judgment is to reduce the hours awarded by a percentage.  Id. at 770.  However, in this case the magistrate judge performed a line-by-line analysis of the bills presented.  Rather than simply cutting the award by a percentage to compensate for the lack of billing judgment exercised, the magistrate judge undertook a meticulous analysis of the bills.  We agree with the district court that the percentage reduction is nothing more than an abbreviated way of performing the task ultimately performed by the magistrate judge.  Thus, we find nothing erroneous in the court's decision to adopt the magistrate judge's recommendation.

B.

Moreover, Tulane argues that Green was improperly awarded fees incurred in connection with the workers' compensation suit.  In particular, Tulane contends that the granting of fees attributable to depositions taken in that case are inappropriate. It also opposes the awarding of fees associated with Green's state court lawsuit.

The magistrate judge's grant of fees associated with attending depositions in the workers' compensation case was reasonable in light of the realities of this litigation. The workers' compensation case made available to Green's counsel information and discovery which was necessary to effectively litigate the Title VII claim.  For example, Green's counsel attended Nero's deposition in the workers' compensation case because it was a sworn statement of a crucial witness.  Moreover, the magistrate judge excluded as redundant all work on the state law claim after the filing of the federal suit.  As such, we find no merit in Tulane's argument.

## C.

Tulane contends that the award of $175/hour for Ms. Burnthorn, an attorney who practiced employment law for fourteen years, and $110/hour for Mr. Johnson, who was practicing law just over a year at the time of trial, was outside of the prevailing market rate. Reasonable hourly rates are determined by looking to the prevailing market rates in the relevant legal community. See Watkins v. Fordice, 7 F.3d 453, 458-59 (5th Cir. 1993). We find nothing clearly erroneous in this determination.

## D.

Tulane further argues that the district court improperly referred to the "means available to Tulane" in defending this case, and that it abused its discretion when it considered the difficulty of the case "to bring and win" when determining whether a reduction in the amount of the lodestar was appropriate. Tulane asserts that the district court had already considered this second Johnson factor when arriving at the lodestar amount, and thus should not have reconsidered it when determining whether to reduce the lodestar. The district court properly considered this evidence when deciding whether the attorneys' fee award was appropriate. The reasonableness of the time Green's counsel spent working on this litigation could best be determined by referencing the litigation strategy employed by Tulane. Tulane fails to show an abuse of discretion by the trial court.

## E.

Tulane asserts that the eighth Johnson factor, dealing with a plaintiff's success, warrants a reduction in the lodestar. Tulane argues that Green was not completely successful because all of her claims against Richardson were dismissed, as well as her claims of intentional infliction of emotional distress and respondeat superior against Tulane. It also asserts that Green's claim for punitive

damages was dismissed. We find this argument without merit. Green was highly successful. In fact, she received the statutory cap in compensatory damages.

## F.

Tulane submits that the district court abused its discretion when it failed to reduce the lodestar based on the twelfth Johnson factor, which looks to awards in similar cases. It argues that similar cases reveal that the fee award in this case is excessive. Tulane points out that the district court noted that the fee award in this case was unprecedented in this circuit.

The district court found that countervailing factors within the Johnson framework supported its decision not to reduce the lodestar. We agree. As the court noted, sexual harassment suits are extremely difficult to bring and to win, and Tulane vigorously litigated this case, which required an appropriate response from Green's counsel.

## G.

Tulane also contends that the district court was obligated to consider the amount of damages awarded in comparison to the attorneys' fees sought. Tulane notes that Green sought $444,000 in attorneys' fees, which was more than she was awarded in damages. At the outset, we note that Green did not receive $444,000 in fees, but instead her request was cut substantially by the district court and she was awarded $302,285. The amount of damages a plaintiff recovers is only one of many factors that a court must consider when calculating an award of attorneys' fees. An attorneys' fee award does not need to be commensurate with the actual amount of dollars awarded to the plaintiff. City of Riverside v. Rivera, 477 U.S. 561, 574 (1986). Rather, "[c]ounsel for [a] prevailing part[y] should be paid, as is traditional with attorneys compensated by a fee-paying client, for all time

reasonably expended on a matter." Id. at 575 (internal quotations and citations omitted). Thus, the fee award in this case was not improper.

<h2 style="text-align:center">XIII.</h2>

Finally, Tulane contends that Green failed to follow the appropriate procedure for requesting costs, and therefore, the right to such costs was waived. It asserts that Green did not file a bill of costs with the Clerk of Court until June 19, 2000, which exceeded the thirty days allowed under the district court's Local Rule 54.3. Tulane argues that the district court erred in sua sponte granting Green an extension of time. It asserts that FED. R. CIV. P. 6(b)[8] does not allow the court to use its discretion to extend the time to file a bill of costs unless a motion is made. Further, it argues that Green did not establish that her failure to file was due to excusable neglect.

Rule 54(d)(2)(B) states that "[u]nless otherwise provided by statute or order of the court, [a] motion [for attorneys' fees and expenses] must be filed and served no later than 14 days after entry of judgment." FED. R. CIV. P. 54(d)(2)(B). Local Rule 54.3 requires a party to move for fees "[w]ithin 30 days after receiving notice of entry of judgment." UNIF. LOCAL R. U.S. DIST. CTS. E., M., W. DISTS. LA. 54.3. The local rule is a court order satisfying the "unless" clause of Federal Rule 54(d)(2)(B). When a party fails to timely move for costs, courts generally disallow the award. See Quarles v. Oxford Mun. Separate Sch. Dist., 868 F.2d 750, 758 (5th Cir. 1989).

---

[8] Rule 6(b) provides in relevant part that:

When . . . by order of court an act is required . . . to be done at or within a specified time, the court for cause shown may at any time in its discretion . . . upon motion made . . . permit the act to be done where the failure to act was the result of excusable neglect.

FED. R. CIV. P. 6(b).

The district court found that conflicting orders of the court accounted for the failure to file a bill of costs with the Clerk of Court within the thirty days required. The court acknowledged that it ordered counsel to proceed before the Clerk of Court with respect to costs and before the magistrate judge with respect to attorneys' fees. However, a subsequent order entered by the magistrate judge required plaintiff to file her brief in support of attorneys' fees *and* costs by January 24, 2000. Green apparently followed that order.

Even if the application for costs was untimely, the time limit set forth in Rule 54 is not jurisdictional, and as such, the court may entertain a motion for costs if the purposes of Rule 54 are satisfied. Romaguera v. Gegenheimer, 162 F.3d 893, 895 (5th Cir. 1998) ("Rule 54(d)(2) sets out the minimum requirements needed to effectuate a valid notice of the request. The failure to file the request would ordinarily result in a request being denied. However, a court may deem a notification sufficient if it satisfies the intended purposes of Rule 54(d)(2)."). Rule 54's purpose was fulfilled because Tulane was put on ample notice that Green would be seeking fees.

The court considered these facts and exercised its discretion by extending the time to file. We find that the court acted well within its discretion. See White v. New Hampshire Dep't of Employment Sec., 455 U.S. 445, 454 n.17 (1982) (noting that district courts are free to adopt local rules establishing standards for timely filing of requests for costs but that the court retains discretion under Rule 54(d)).

## XIV.

We hereby find Tulane's appeal timely and AFFIRM the district court's judgment with regard to (1) Green's claim for punitive damages, (2) Green's claims of sexual harassment and retaliation,

27

(3) its evidentiary rulings and refusal to give Tulane's requested jury instruction, and (4) its award of fees and costs.