Michael NIGRO

v.

**ST. TAMMANY PARISH HOSPITAL, et al.**

No. CIV.A. 04–1483.

United States District Court, E.D. Louisiana.

June 6, 2005.

Jill Leininger Craft, Jill L. Craft, Attorney at Law, Baton Rouge, LA, Angela Wilt Cox, Angela Wilt Cox, Attorney at Law, Slidell, LA, for Michael Nigro, Plaintiff.

Charles H. Hollis, Ashley O'Dwyer Day, Rachel E. Linzy, Robert P. Lombardi, The Kullman Firm, New Orleans, LA, for St. Tammany Parish Hosp., defendant.

Keith M. Pyburn, Jr., Scott David Schneider, Fisher & Phillips, LLP, New Orleans, LA, for Louisiana EM-1 Medical Services, P.C. incorrectly referred to as EmCare of Louisiana, Inc., Defendants.

## ORDER AND REASONS

LEMMON, District Judge.

**IT IS ORDERED** that defendant St. Tammany Parish Hospital's and defendant EM-1 Medical Services' Motions for Summary Judgment (Documents 30 and 43) are hereby **GRANTED.**

### A. Background.

Plaintiff Michael Nigro is a nurse who worked at St. Tammany Parish Hospital. Beginning in January 2001, Nigro began working as a charge nurse during the hospital's night shift. In 2003 one of the physicians in the emergency room, Dr. Rebecca Gorton, informed her coworkers that she would be undergoing gender reassignment surgery in California. Gorton approached "[a]nybody she would be apt to work with" and "any new people or anybody who would listen," both on the night shift and on other shifts as well, and informed both male and female coworkers of her decision.[1] Nigro testified at his deposition that Gorton continued discussing her surgery with her coworkers after the initial revelation, using vulgar and graphic descriptions of how the transformation would take place, until it became a "nightly

affair" that "became more and more graphic and explicit."[2] Nigro complained about Gorton's "offensive" behavior to Dr. John Gavin, the emergency room physician director, and to Danny Cain, the nurse manager.

Gorton underwent gender reassignment surgery and accompanying hormonal treatment in 2003, and changed her name to Dr. Ryan Nicolas Gorton. Nigro alleges that Dr. Gorton's offensive comments continued after returning to work following the surgery.

Nigro alleges that beginning in May 2003, defendants retaliated against him for complaining about Dr. Gorton by excessively criticizing him, and ultimately demoting him in August 2003 from Charge Nurse on the night shift to Staff Nurse on the day shift.

On December 20, 2003, Nigro filed a charge of discrimination with the EEOC, and he alleges that thereafter his supervisors demeaned him and subjected him to wrongful criticism at a meeting in May 2004. Nigro then tendered his two-week notice. He alleges that his job loss was the result of a constructive discharge.

On May 26, 2004, Nigro filed suit against the hospital under federal and state law, alleging (1) that Dr. Gorton sexually harassed him; (2) that his demotion in August 2003 was in retaliation for his complaints about Dr. Gorton's harassment; (3) that he was constructively discharged in May 2004 as a result of his filing an EEOC charge; and (4) that defendant committed the tort of intentional infliction of emotional distress. Nigro subsequently amended his complaint on October 28, 2004 to add EM-1 Medical Services as a defen-

---

1. Depo. Nigro at 64, 93.

2. *Id.* at 66; *see also* Plaintiff's Complaint at ¶ 7; Depo. Nigro at 67–68, 69, 77, 83, and 103.

dant, alleging that EM–1 was his joint employer.

## B. Analysis.

### 1. Summary judgment standards.

Rule 56 provides that summary judgment "shall be rendered forthwith" if the pleadings and evidence demonstrate "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The Supreme Court has held that "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient" to prevent summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. 2505. The inferences the court may draw from the underlying facts in the affidavits, depositions, and exhibits "must be viewed in the light most favorable to the party opposing the motion." *McAvey v. Lee,* 260 F.3d 359, 363 (5th Cir.2001) (*quoting United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)).

### 2. Plaintiff's claims against defendant EM–1.

▉▉▉ Plaintiff alleges that defendant EM–1 was his joint employer. In *Trevino v. Celanese Corp.,* 701 F.2d 397 (5th Cir. 1983), the Fifth Circuit held:

The term "employer" as used in Title VII of the Civil Rights Act was meant to be liberally construed. Over the past decade, numerous courts have drawn upon theories and rules developed in the related area of labor relations in determining when separate business entities are sufficiently interrelated for an employee whose Title VII rights have been violated to file a charge against both entities. Thus, the rule has emerged that superficially distinct entities may be exposed to liability upon a finding that they represented a single, integrated enterprise: a single employer. Factors considered in determining whether distinct entities constitute an integrated enterprise are (1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control.

*Id.* at 403–04. The primary focus of the four part test is on factor two, and "[t]his criterion has been further refined to the point that '[t]he critical question to be answered then is: What entity made the final decisions regarding employment matters related to the person claiming discrimination?'" *Vance v. Union Planters Corp.,* 279 F.3d 295, 297 (5th Cir.2002).

▉▉▉ There is no evidence in the record supporting Nigro's allegation that EM–1 was his joint employer. EM–1 did not make any "final decisions regarding employment matters" related to Nigro.[3] The only interrelation of operations between defendants is that EM–1 supplied physicians who worked in the St. Tammany Parish Hospital emergency room. There is no evidence in the record that defendants had common management or

---

**3.** Nigro cites his own deposition and the Declaration of Dr. Gavin for his argument that EM–1 had employment authority over him. *See* Plaintiff's Opposition to EM–1's Statement of Undisputed Material Facts at ¶ 9. Nigro's deposition testimony does not support his argument, and Dr. Gavin's declaration states only that "EmCare physicians would report complaints regarding nursing to St. Tammany Parish Hospital. EmCare physicians would give orders to nurses employed by St. Tammany Parish Hospital." Gavin Declaration at 6.

common ownership. Additionally, Nigro did not file an EEOC charge against EM–1, and "a party not named in an EEOC charge may not be sued under Title VII unless there is a clear identity of interest between it and the party named in the charge or it has unfairly prevented the filing of an EEOC charge." *Way v. Mueller Brass Co.*, 840 F.2d 303, 307 (5th Cir. 1988). The record does not reflect any identity of interest between defendants. Accordingly, because EM–1 was not Nigro's joint employer and he did not file an EEOC charge against it, EM–1's motion for summary judgment is granted.

### 3. Plaintiff's sexual harassment claim.

▉ The Fifth Circuit has held that a plaintiff making a Title VII sexual harassment claim must establish that:

(1) The employee belongs to a protected group, (2) the employee was subject to unwelcome sexual harassment, (3) the harassment complained of was based on sex, (4) the harassment affected a "term, condition, or privilege of employment," i.e., the sexual harassment must be sufficiently severe or pervasive to as to alter the conditions of employment and create an abusive working environment; and (5) Respondeat superior, i.e., that the employer knew or should have known of the harassment and failed to take prompt remedial action.

*Watts v. Kroger Co.*, 170 F.3d 505, 509 (5th Cir.1999); *Green v. Administrators of the*

*Tulane Educational Fund,* 284 F.3d 642, 655 (5th Cir.2002).

▉ In order to determine whether the alleged harassment was "based on sex," the key inquiry is whether members of one gender were treated differently than members of the other:

Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at "*discriminat[ion]* ... because of ... sex." We have never held that workplace harassment, even harassment between men and women, is automatically discrimination because of sex merely because the words used have sexual content or connotations. "The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed."

*Oncale v. Sundowner Offshore Services, Incorporated,* 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998).[4] The evidence is undisputed that Dr. Gorton directed her discussions of the details of the sex change procedure towards male and female coworkers equally. Nigro presents no evidence that Dr. Gorton treated him any differently from his coworkers. To the contrary, plaintiff explained that Dr. Gorton described the details to everyone around. There is no evidence that any such alleged disparate communications were based on Nigro's gender. Accordingly, defendants' motion for summary judg-

---

**4.** *See also Green,* 284 F.3d at 657 (affirming district court's conclusion that "the critical issue, in the Title VII context, is whether [plaintiff] was exposed to disadvantageous terms or conditions of employment to which members of the opposite sex were not"); *Ackel v. National Communications, Inc.,* 339 F.3d 376, 382 (5th Cir.2003) (granting summary judgment to employer on sexual harassment claim because evidence demonstrated supervisor transferred plaintiff "not based on her

gender," but rather because she occupied a position in which the supervisor wished to place his paramour); *Bagley v. Regis Corp.,* 2004 WL 2826810, at *3 (N.D.Tex. Dec.7, 2004) ("Atchison's alleged discussions of homosexuality and male genitalia, which he directed toward men and women, and which were not motivated by Plaintiff's gender, cannot have contributed to the alleged hostile work environment.").

ment on Nigro's sexual harassment claim is granted.

### 3. Plaintiff's claim for retaliation under Title VII.

Plaintiff contends that the hospital retaliated against him for complaining about Dr. Gorton's harassment by demoting him in August 2003, and retaliated against him for filing his EEOC charge by constructively discharging him in May 2004.

#### a. Nigro's alleged demotion in August 2003.

■ In order to establish that defendants retaliated against him in violation of Title VII, Nigro must demonstrate that (1) he engaged in "protected activity," (2) he suffered an "adverse employment action," and (3) there was a "causal nexus" between the protected activity and the adverse action. *Green*, 284 F.3d at 657. Additionally:

Protected activity is defined as opposition to any practice made unlawful by Title VII, including making a charge, testifying, assisting, or participating in any investigation, proceeding, or hearing under Title VII. Adverse employment actions include only ultimate employment decisions such as hiring, granting, leave, discharging, promoting, or compensating. To determine causation, an employee must show that "but for" the protected activity, the adverse employment action would not have taken place.

*Green*, 284 F.3d at 657.

■ Defendants argue that Nigro's initial complaints concerning Gorton's alleged harassment cannot form the basis for a retaliation claim because the actions

he complained of are not unlawful under Title VII. Title VII "does not require that a plaintiff prove that the conduct opposed was actually in violation of Title VII, but only that a charge was made or that participation in an investigation of a violation of Title VII occurred". *Green*, 284 F.3d at 657. However, the evidence reflects that Nigro's initial complaints did not concern gender harassment. As Nigro testified at his deposition, he told the emergency room physician director, Dr. John Gavin, that he was "offended" by Dr. Gorton:

I told him I was offended by all the talk [by Dr. Gorton] that was going on. And he also said that he has heard that it was getting out of hand and that he didn't want to hear about it either. And I told him I'd like to not be around and I'd like to not listen to it anymore and not have it discussed in the nurse's station. And he said he would address it.[5]

After this complaint, Nigro testified that he "continued to say to [Dr. Gavin] it was really out of hand. I don't want to listen to it anymore."[6] Nigro also complained to Danny Cain, the nurse manager, in similar terms:

I told him I was uncomfortable. That I had already spoken to Dr. Gavin, and I though it was inappropriate to be discussing this. I was offended by it. I thought it was also done within patients' earshot. And that there was nowhere for me to go to get away from it, unless I left my duties and left the emergency room.[7]

These complaints do not form the basis for a Title VII retaliation claim because they did not concern sexual harassment, only

---

5. Depo. Nigro at 80.

6. Nigro testified that the second time he spoke to Dr. Gavin, he told him "that the conversations were continuing and I was just tired of it. And I was tired that that was the center of the ER's focus at that point; and I

thought time could be better spent than that. I continued to be offended by the verbiage and by the talking about it. And he said—he again agreed with me." Depo. at 95.

7. Depo. Nigro at 86.

that Dr. Gavin had generally offended him. *See Watts,* 170 F.3d at 511(employee's informal complaints did not constitute protected activity under Title VII because employee did not report any sexual harassment); *Sitar v. Indiana Dep't of Transportation,* 344 F.3d 720, 727 (7th Cir.2003) (granting summary judgment to defendant on retaliation claim because plaintiff "complained only that she felt picked on, not that she was discriminated against 'because of' sex or gender, which is what Title VII requires").

### b. Nigro's constructive discharge in May 2004.

 Nigro filed a formal EEOC complaint on December 20, 2003. "The filing of an EEOC complaint is clearly a protected activity within the meaning of the statute." *Hockman v. Westward Communications, LLC,* 407 F.3d 317, 330 n. 4 (5th Cir.2004). Nigro may establish a that defendants retaliated against him after he filed this charge by either (1) presenting direct evidence of retaliation, or (2) by providing circumstantial evidence creating a rebuttable presumption of retaliation. *Fabela v. Socorro Independent School District,* 329 F.3d 409, 414–15 (5th Cir.2003).

 "In a Title VII context, direct evidence includes any statement or document which shows on its face that an improper criterion served as a basis—not necessarily the sole basis, but *a* basis—for the adverse employment action." *Id.* at 415 (italics in original). The court finds that there is no direct evidence of retaliation in the record for Nigro's filing an EEOC complaint.

 Nigro may also demonstrate retaliation "through the use of circumstantial evidence and the famed *McDonnell Douglas* burden-shifting framework." *Fabela,* 329 F.3d at 415. Under *McDonnell Douglas,* plaintiff bears the burden of establishing a prima facie case through circumstan-

tial evidence of a retaliatory motive. If the plaintiff succeeds, he creates a rebuttable presumption of retaliation, and the burden shifts to the employer to demonstrate a legitimate reason for the adverse employment action. If the employer does so, the burden shifts again to the plaintiff to rebut the employer's nondiscriminatory rationale. *Id.* at 415 n. 6. The causation requirement is lessened at the *prima facie* stage:

> At the prima facie stage, "the standard for satisfying the causation element is 'much less stringent' than a 'but for' causation standard." Nevertheless, the plaintiff must produce *some* evidence of a causal link between the protected activity and the adverse employment action to establish a prima facie case of retaliation.

*Ackel,* 339 F.3d at 385 (italics in original).

 Nigro argues he was constructively discharged in May 2004, following his EEOC complaint. Constructive discharge occurs when plaintiff shows that "working conditions were 'so intolerable that a reasonable employee in her position would [have felt] compelled to resign.'" *Hockman,* 407 F.3d at 331. There is no evidence in the record supporting a *prima facie* case that Nigro was constructively discharged because of his EEOC complaint. While an inference of causation may be drawn when the adverse employment action follows closely behind the filing of an EEOC charge, Nigro's constructive discharge did not occur until five months after his EEOC charge. This is insufficient, standing alone, to support an inference of causation. *Raggs v. Mississippi Power & Light Co.,* 278 F.3d 463, 471–72 (5th Cir.2002) (holding five month gap insufficient by itself to show causal link). Although Nigro argues that Dr. Gavin's affidavit provides evidence of retaliation, Dr. Gavin did not state that Nigro

was retaliated against for complaining of sexual harassment, but instead stated in a conclusional manner that "It became very obvious that Michael Nigro was receiving retaliation in the form of disciplinary actions for his complaints regarding Dr. Gorton." Additionally, the court finds that there are no genuine issues of material fact regarding Nigro's failure to demonstrate that defendants constructively discharged him because of his EEOC complaint. The evidence in the record amply supports defendants' argument that Nigro was terminated for his failure to follow hospital policy, combative and lazy behavior, and failure to comply with his supervisors' directives.

### 4. Plaintiff's claim for intentional infliction of emotional distress.

Under Louisiana law, to establish a claim for intentional infliction of emotional distress, a plaintiff must demonstrate:

(1) [T]hat the conduct of the defendant was extreme and outrageous; (2) that the emotional distress suffered by the plaintiff was severe; and (3) that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct.

*Viator v. Miller*, 900 So.2d 1135, 1140–41 (La.App. 3d Cir. April 27, 2005). The Supreme Court of Louisiana has recognized that the conduct in question must be extreme and intolerable:

The conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. Liability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. Persons must necessarily be expected to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind.

*White v. Monsanto*, 585 So.2d 1205, 1208 (La.1991). "The distress suffered must be such that no reasonable person could be expected to endure it. Liability arises only when the mental suffering or anguish is extreme." *Id.* at 1210 Additionally, "the mere fact that the actor knows that the other will regard the conduct as insulting, or will have his feelings hurt, is not enough." *White*, 585 So.2d at 1210; *Nguyen v. Buchart–Horn, Inc.*, 2003 WL 21674461, at *4 (E.D.La. July 15, 2003).

Under these standards, defendants' motions for summary judgment on Nigro's claim for intentional infliction of emotional distress is granted. Nigro argues that genuine issues of material fact exist regarding the pervasiveness of defendants' conduct, defendants' allegedly deliberate inaction concerning Gorton's harassment, and its impact on Nigro. However, the record contains no evidence that Gorton's conduct was atrocious and utterly intolerable in a civilized community. Viewing the evidence in the light most favorable to Nigro, Dr. Gorton may have engaged in numerous conversations at work with his nurses and other subordinates about his gender reassignment procedure, conversations in which explicit vulgar references to Dr. Gorton's sex organs and the transformation thereof, and references to his private sex life were commonplace. While tasteless and obnoxious, such conversations are not "utterly intolerable in a civilized community."

Additionally, summary judgment is appropriate regardless of whether Gorton may have intended to embarrass or irritate Nigro through these conversations. "The conduct must be intended or calculated to cause severe emotional distress and not just some lesser degree of fright, hu-

miliation, embarrassment, worry or the like." *White,* 585 So.2d at 1210; *Clark v. Acco Systems, Inc.,* 899 So.2d 783, 787 (La.App. 2d Cir.2005). There is no evidence that Dr. Gorton intended to cause Nigro severe emotional distress and embarked on a campaign calculated to do so.[8]

C. Conclusions.

Defendants' Motions for Summary Judgment are hereby granted.

8. Nigro has also asserted discrimination claims under Louisiana state law. Louisiana courts "have looked to federal jurisprudence to interpret Louisiana discrimination laws." *King v. Phelps Dunbar,* 743 So.2d 181, 187 (La.1999). Accordingly, Nigro's state discrimination claims are dismissed.