374 A.2d 1022.

## The Narragansett Electric Company *vs.*
## Rhode Island Commission for Human Rights.

JUNE 21, 1977.

PRESENT: Bevilacqua, C. J., Paolino. Joslin, Kelleher and Doris, JJ.

Doris, J. This is a petition for certiorari by the Narragansett Electric Company (Narragansett) pursuant to G.L. 1956 (1969 Reenactment) §42-35-15. Narragansett seeks review of a judgment of a Superior Court justice affirming an order of the respondent, Rhode Island Commission for Human Rights (the commission). The portion of the commission's order in question directed Narragansett to refrain from treating pregnancy-related disabilities of its employees differently from other disabilities. We grant the petition and quash the judgment of the Superior Court.

This case arose from a complaint issued by the commission charging that Narragansett's policies concerning pregnant employees constituted discrimination because of sex in violation of G.L. 1956 (1968 Reenactment) §28-5-7(A), as amended by P.L. 1973, ch. 132, §1.[1] The policies in question were: first, that Narragansett required a pregnant employee to take a leave of absence from the end of her fifth month of pregnancy until a specified time after childbirth, and also imposed mandatory leaves of

---

[1]That statute provides, in part:

"It shall be an unlawful employment practice:

"(A) for any employer (1) to refuse to hire any applicant for employment because of his race or color, religion, sex, physical handicap, or country of ancestral origin, or (2) because of such reasons, to discharge an employee or discriminate against him with respect to hire, tenure, compensation, terms, conditions or privileges of employment, or any other matter directly or indirectly related to employment, or (3) in the recruiting of individuals for employment or in hiring them, to utilize any employment agency, placement service, training school or center, labor organization, or any other employee referring source which such employer knows, or has reasonable cause to know, discriminates against individuals because of their race or color, religion, physical handicap, or country of ancestral origin***."

absence after abortion and miscarriage; second, that Narragansett suspended an employee's health insurance and other benefits during the pregnancy-related leaves of absence described above; and third, that Narragansett excluded pregnancy-related disabilities from its temporary disability benefit plan.

After public hearings, the commission forbade Narragansett from continuing the above practices. Narragansett did thereafter eliminate the mandatory leave requirements, but appealed the balance of the order to the Superior Court on the ground that the practices in question were not discriminatory. Subject to minor changes not here relevant, the order was affirmed. Narragansett sought review of that decision by certiorari before this court, and we stayed the commission's order pending our decision.

The commission held all of the policies in question unlawful on the ground that they contained distinctions based on pregnancy. Thus, the issue in this case is whether an employment classification based on pregnancy comes within the meaning of discrimination "because of * * * sex" as that phrase is used in §28-5-7(A). The State Fair Employment Practices Act, in which the above section appears, has seldom been interpreted by this court. However, it is, in relevant part, closely parallel to Title VII of the Civil Rights Act of 1964. In particular, the language of Title VII appearing in 42 U.S.C.A. §2000e-2[2] is virtually the same as that in §28-5-7(A). For these reasons we think it appropriate in this case to refer to federal decisions dealing with Title VII. Those auth-

---

[2]That section provides, in pertinent part:

"(a) It shall be an unlawful employment practice for an employer —
　(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his Compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin***."

orities of course are not binding on us, since the matter before this court is solely one of interpretation of state law. They are, however, persuasive.

We note at the outset that this issue has been the subject of extensive litigation in the federal courts. Although there has been conflict in the circuit courts, the Supreme Court recently held, on facts virtually identical to those before us, that the denial of pregnancy disability benefits does not constitute sex discrimination under Title VII. *General Elec. Co.* v. *Gilbert,* 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976). For the reasons which follow we concur with the decision in that case.

As noted above, we are faced with a question of statutory interpretation. Beyond the words "discriminate because of sex" there is little in the statute itself to clarify the intended scope of the statutory prohibition.[3] It is therefore our duty to attempt to ascertain and apply the commonly accepted meaning of the term "discriminate". As the Court said in *General Elec. Co.* v. *Gilbert, supra*:

> "When Congress makes it unlawful for an employer to 'discriminate * * * on the basis of * * * sex * * *', without further explanation of its meaning, we should not readily infer that it meant something different than what the concept of discrimination has traditionally meant * * *." *Id.* at 145, 97 S.Ct. at 413, 50 L.Ed.2d at 360.

It seems to us that a classification based on pregnancy does not come within the usual meaning of sex discrimination. There is not one rule for men and another for women. Nor does the classification create a situation in which similarly situated individuals are treated differently because of their sex. As the Court stated in *Geduldig*

---

[3]General Laws 1956 (1968 Reenactment) §28-5-6(G) does provide that, "The term 'discriminate' includes segregate or separate." This definition is clearly of little use in the present case.

v. *Aiello,* 417 U.S. 484, 94 S.Ct. 2485, 41 L.Ed.2d 256 (1974), where the exclusion of pregnancy from a state disability program was held not to be sex discrimination within the meaning of the equal protection clause of the Federal Constitution:

> "[T]his case is thus a far cry from cases like *Reed* v. *Reed,* 404 U.S. 71 (1971), and *Frontiero* v. *Richardson,* 411 U.S. 677 (1973), involving discrimination based upon gender as such. The California insurance program does not exclude anyone from benefit eligibility because of gender but merely removes one physical condition — pregnancy — from the list of compensable disabilities. While it is true that only women can become pregnant, it does not follow that every legislative classification concerning pregnancy is a sex-based classification like those considered in *Reed, supra,* and *Frontiero, supra.* Normal pregnancy is an objectively identifiable physical condition with unique characteristics. Absent a showing that distinctions involving pregnancy are mere pretexts designed to effect an invidious discrimination against the members of one sex or the other, lawmakers are constitutionally free to include or exclude pregnancy from the coverage of legislation such as this on any reasonable basis, just as with respect to any other physical condition.
>
> "The lack of identity between the excluded disability and gender as such under this insurance program becomes clear upon the most cursory analysis. The program divides potential recipients into two groups—pregnant women and nonpregnant persons. While the first group is exclusively female, the second includes members of both sexes. The fiscal and actuarial benefits of the program thus accrue to members of both sexes." *Id.* at 496, n.20, 94 S.Ct. at 2492, n.20, 41 L.Ed.2d at 264-65, n.20.

The fact that *Geduldig* was decided on an equal protection theory, not on the basis of Title VII, does not detract from the persuasiveness of its reasoning. The

same underlying policies operate in both contexts. The Supreme Court held in *General Elec. Co.* v. *Gilbert, supra,* that the analysis of discrimination appearing in *Geduldig* was relevant to Title VII, and we agree. Although the Congress was free to use the term "discriminate" in Title VII other than in its constitutional sense, just as our Legislature was free to do so in §28-5-7(A), there is no indication that they so intended.[4] Accordingly, we find the reasoning of *Geduldig* applicable to the case at bar.

We are aware that the stance we take in this case regarding the meaning of sex discrimination has been faulted as being excessively technical or unrealistic. To hold that a pregnancy exclusion is sex-neutral, it is claimed, ignores the plain fact that pregnancy is functionally equivalent to sex. The argument, simply put, is that the ability to become pregnant is the primary feature which distinguishes women from men; hence, a classification based on the ability to become pregnant is by definition sex-based. *See General Elec. Co.* v. *Gilbert, supra* at 161-162, 97 S.Ct. at 421, 50 L.Ed.2d at 370 (dissenting opinion).

This approach, in our view, overlooks the fact that "the ability to become pregnant" is simply not the classification in question. There is no benefit which is paid or denied

---

[4] The controversy over whether the constitutional and statutory meanings are the same has lost a great deal of currency since 1972 when Title VII was amended to include both state and federal employees. However, in interpreting Title VII courts have freely relied on concepts of discrimination enunciated in equal protection cases, without suggesting any difference between the two. *See United States* v. *Chesterfield County School Dist.,* 484 F.2d 70 (4th Cir. 1973); Comment, *Geduldig* v. *Aiello: Pregnancy Classifications and the Definition of Sex Discrimination,* 75 Col. L. Rev. 441, 467 n. 137 (1975). We recognize, as is discussed at greater length below, that the establishment of a prima facie case differs in the two contexts, in that under Title VII a discriminatory effect may be enough. *See Washington* v. *Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). But there is no indication that there is any difference in the concept of what the term "discrimination" means in the two contexts.

to persons having or not having that ability. If there were such a distinction, if for example Narragansett had a different salary schedule for those who "had the capacity to become pregnant", it would obviously be equivalent to sex discrimination. But that is not the situation before us. The classification is not "those with the capacity to become pregnant"; it is "those who *are* pregnant." While the former defines a class which includes all women and excludes all men, and so is truly sex-based, the latter does not.

It is claimed, though, that the above distinction is in reality empty and misleading because it does not take into account the fact that women are the only ones denied benefits because only they become pregnant. To establish a truly nondiscriminatory policy, it is argued, an employer cannot ignore such inherent sexual differences. If pregnancy is unique, then the meaning of "discriminate" must be adjusted to accord with "women's biologically more burdensome place in the scheme of human existence,"[5] we are told.

However, a prohibition against discrimination between two groups, without more, has not traditionally been taken to mean that the classifications in question must be established so as to compensate for any dissimilarities the groups might have. Nondiscrimination between groups has meant evenhanded treatment. We do not believe that the Legislature intended anything other than this in §28-5-7(A).

It may be that to declare Narragansett's policy discriminatory would be more socially desirable than the result we reach today. But it is not our function to choose what might be, in our view, a socially desirable result. The aim is to construe the statute before us in view of

---

[5] *Gilbert* v. *General Elec. Co.,* 375 F. Supp. 367, 383 (E.D. Va. 1974).

applicable precedent and legislative purposes. We conclude that the Legislature did not intend a classification based on pregnancy, per se, to constitute unlawful discrimination because of sex.

We also conclude that the pregnancy exclusion is not a mere pretext designed to invidiously discriminate against women. Neither the commission nor the Superior Court made a finding that this policy was the result of intentional or purposeful discrimination. Moreover, pregnancy is in many ways unlike other disabilities. That is, pregnancy is not a disease. Disability due to pregnancy is not as sudden or unforseeable as that due to accidents or sickness. Although not always the case, pregnancy is often a voluntarily undertaken and desired condition. Furthermore, there is some indication that at present a significantly greater proportion of women do not return to work after maternity leave than do employees who are temporarily disabled for some other reason. *Gilbert* v. *General Elec. Co.*, 375 F. Supp. 367, 378 (E.D. Va. 1974).[6] That pregnancy differs from other disabilities in these respects is persuasive evidence that its exclusion was not a mere pretext for discrimination.

The commission discounted these differences because other disabilities having these distinguishing features are, in fact, covered by the benefits program. For example, disabilities resulting from pursuits such as sporting events are "voluntary", yet they are included. Surgery may often

[6] In this case, Narragansett claims in its memorandum to the Superior Court that out of 257 female employees who left its employ because of pregnancy over the past 20 years, only two or three returned to work upon recovery from childbirth. Since temporary disability benefits are intended to provide a "bridge" between two periods of employment, the exclusion of pregnancy can be seen as following reasonably from the rationale of the compensation policy, rather than being the result of an attempt to discriminate.

be scheduled well in advance, and so may be forseeable. Certain disabilities are not in fact due to disease, as such.

While we do not deny the above, it remains true that pregnancy is unique in that it has significantly more of these distinguishing features than other disabilities. When the cumulative effect of these characteristics is considered, it becomes clear that pregnancy is in fact not like other disabilities. It is this uniqueness which negates any inference that Narragansett's policy was a mere pretext for discrimination.

Next, we must consider whether Narragansett's plan was discriminatory in effect. A prima facie violation of Title VII (and, presumably, §28-5-7(A)) may be established by proof of a discriminatory effect on a class of employees. *Albemarle Paper Co.* v. *Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *Griggs* v. *Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). Here, no such effect was shown. There was no contention that the value of benefits received under Narragansett's disability plan was less for women than for men, nor did the commission make any findings on the point. In the absence of such evidence, the mere fact that pregnant women do not recieve disability benefits does not establish a discriminatory effect. As the Court said in *General Elec. Co.* v. *Gilbert, supra:*

> "For all that appears, pregnancy-related disabilities constitute an *additional* risk, unique to women, and the failure to compensate them for this risk does not destroy the presumed parity of the benefits accruing to men and women alike, which results from the facially evenhanded *inclusion* of risks. To hold otherwise would endanger the common-sense notion that an employer who has no disability benefits program at all does not violate Title VII even though the "underinclusion" of risks impacts, as a result of

pregnancy-related disabilities, more heavily upon one gender than upon the other." *Id.* at 139-140, 97 S.Ct. at 409-10, 50 L.Ed.2d at 356.

In closing, several observations are pertinent. It has been suggested to us that the pregnancy exclusion is analogus to a hypothetical sickle-cell anemia exclusion. It is argued that no court could help but construe the latter as race discrimination despite facial racial neutrality; hence, advocates of this position argue that to be consistent we should find sex discrimination in this case. However, the reason that the sickle-cell anemia exclusion seems so clearly racial is that nobody has yet suggested a plausible, nonracial explanation for such exclusion. As a result, the exclusion alone supports an inference that it is a mere pretext for racial discrimination. Because of the neutral factors discussed above, the same does not hold true for pregnancy.

The example posed by Justice Brennan in his dissent to *General Elec. Co.* v. *Gilbert, supra,* in which an employer excludes every disability having a predominant effect upon women, presents a similar case. Our analysis would not, as he suggests, find such a policy nondiscriminatory because it was facially sex-neutral. There is no non-sexual explanation for such an exclusion; it would undoubtedly be termed a pretext for invidious discrimination.

We also note that if Narragansett had no disability program but instead paid the present cost of disability insurance directly to its employees as wages, there would be no unequal treatment of the employees and no violation of §28-5-7(A). However, if the employees in turn took the money and purchased disability insurance, women would either not be compensated for pregnancy disability, or would pay greater premiums than men to secure such coverage. Comment, *Gender Classifications*

*in the Insurance Industry,* 75 Col. L. Rev. 1381 (1975). Thus, if we held Narragansett's present policy to be discriminatory, the anomalous result would be that the legality of excluding pregnancy from disability plans would turn on a change in form little more significant than a change in bookkeeping methods. We do not believe the Legislature intended such a result. Accordingly, we hold that failure to provide disability payments and other company benefits to those having pregnancy-related disabilities does not constitute discrimination because of sex within the meaning of §28-5-7(A).

The petition for certiorari is granted, the judgment entered in the Superior Court is quashed, and the records certified to this court are ordered returned to the Superior Court with our decision endorsed thereon.

Mr. Justice Kelleher, with whom Mr. Chief Justice Bevilacqua joins, dissenting. I have no complaint with my brothers' premise that the issue before us is whether an employment classification based on pregnancy is discrimination "because of * * * sex" within G.L. 1956 (1968 Reenactment) §28-5-7(A), as amended by P.L. 1973, ch. 132, §1, but I cannot subscribe to their conclusions. While the majority feel that cases construing Title VII of the Civil Rights Act of 1964 (42 U.S.C.A. §2000e-2) are persuasive, I disagree. We are at liberty to construe our own Fair Employment Practices Act and are not confined by the strictures of the Supreme Court's interpretation of Title VII. There is no question that Rhode Island can provide greater protection of one's rights than is afforded under federal law. *State* v. *Maloof,* 114 R.I. 380, 333 A.2d 676 (1975).

The renowned footnote 20 of *Geduldig* v. *Aiello,* 417 U.S. 484, 496-97, 94 S.Ct. 2485, 2492, 41 L.Ed.2d 256, 264-65 (1974), quoted with approval in *General Elec. Co.* v. *Gilbert,* 429 U.S. 125, 134-135, 97 S.Ct. 401, 407, 50 L.Ed.2d

343, 353 (1976), and by the majority here, defined the classification as one of "pregnant women and non-pregnant persons." From this assertion follows the conclusion that the distinction is not sex-based. Justice Brennan's analysis is far more compelling, however. He reasoned that "[s]uch dissimilar treatment of men and women, on the basis of physical characteristics inextricably linked to one sex, inevitably constitutes sex discrimination." *Geduldig* v. *Aiello, supra* at 501, 94 S.Ct. at 2494, 41 L.Ed.2d at 267. (Brennan, J., dissenting.)

The majority here concede that if the classification were phrased in terms of "had the capacity to become pregnant," this would obviously be tantamount to sex discrimination, but they conclude that this "simply [is] not the classification in question." In their view the class is of "those who *are* pregnant"; thus "[w]hile the former defines a class which includes all women and excludes all men, and so is truly sex-based, the latter does not." I beg to differ. This *is* a classification based on those who have the capacity to become pregnant. Granted, the lack of coverage works a hardship only on those who *do* conceive, but no one who does conceive receives benefits. On the other hand, all persons are covered as to other contingencies, e.g., automobile collision injuries or heart attack, and anyone who unfortunately suffers from such a contingency can recover. Granted, the plan benefits only those who do have the misfortune of being ill or injured, but anyone who is, can recover.

Agreeing, then, with Justice Brennan, I find that our Fair Employment Practices Act prohibits classification based on pregnancy. *See Brooklyn Union Gas Co.* v. *New York State Human Rights Appeal Bd.*, 41 N.Y.2d 84, 359 N.E.2d 393 (1976) (court observed that New York Human Rights Law prohibits singling out pregnancy and childbirth for

disparate treatment from that afforded because of other physical or medical disabilities or impairments).

I come now to Narragansett's plan which speaks in terms of "sickness" or "accident." With comments on accidental pregnancies and thoughts of voluntariness to one side, it still escapes me how this plan can be upheld insofar as it denies benefits for pregnancy-related illnesses, such as miscarriage. While I can see that a normal pregnancy is not a "sickness" or "accident" within the normal meaning of those words, it seems to me that miscarriages or complications arising from an otherwise normal pregnancy do fall within the terms of the plan.

Accordingly, I would uphold the plan's pregnancy exclusion only as it relates to normal, complication-free pregnancies.

*Tillinghast, Collins & Graham, Peter J. McGinn, Elia Germani,* for petitioner.

Attorneys for The New England Telephone and Telegraph Company and The American Telephone and Telegraph Company as Amici Curiae:

*C. Duane Aldrich, William J. McDonald,* Boston, Mass., for New England Telephone and Telegraph Company.

*Charles Ryan, Clark G. Redick,* New York, N.Y., for American Telephone and Telegraph Company.

*Steptoe and Johnson,* of counsel, Washington, D.C.,

*Julius C. Michaelson,* Attorney General, *R. Daniel Prentiss,* Special Asst. Attorney General, for respondent.