DECISION
Plaintiff Timothy Joint ("plaintiff" or "Joint") appeals the October 12, 2004 Decision and Order of the Rhode Island Commission for Human Rights ("Commission"), finding that he discriminated against Durrelle DeMarkey ("DeMarkey") because of her sex with respect to the terms and conditions of employment and, ultimately, her termination. Joint argues that the Commission lacked jurisdiction to hear the matter, that he was not given proper notice regarding the nature of the charges against him, that the Commission committed numerous errors of law in finding him liable for sex discrimination, and that the Commission did not base its award of damages on the reliable, probative, and substantial evidence in the record. In opposition, DeMarkey and the Commission (collectively "defendants") maintain that the decision should be upheld because the appropriate legal standards were applied and the evidence was properly considered. Jurisdiction is pursuant to G.L. 1956 § 42-35-15.
 Facts and Travel
On January 11, 2001, DeMarkey — a thirty-nine year old woman from Connecticut with a high school education — filed a charge against Joint and Island Mortgage Network, Inc. ("Island Mortgage") with the Rhode Island Commission for Human Rights alleging that they discriminated against her, with respect to both the terms and conditions of employment and her termination, because of her sex. Thereafter, an investigation ensued, and Commissioner Richard R. Ferland found that there was probable cause to believe that Joint and Island Mortgage violated G.L. 1956 § 28-5-7. An official complaint was filed by the Commission on December 24, 2002, alleging the following:
 "a. The complainant is a woman, and was employed by the respondents as a Senior Loan Officer. She had been employed for approximately six months at the time of her termination on or around January 14, 2000;
 b. The complainant had a sexual relationship with her supervisor Timothy Joint;
 c. The complainant went on medical leave as a result of the disintegration of her relationship with Mr. Joint. The complainant's treatment provider notified the respondents' Human Resources Director and Mr. Joint that the complainant should have no contact with Mr. Joint. Mr. Joint continued to contact the complainant;
 d. Management was aware of the situation but did not take corrective action;
 e. The respondents terminated the complainant on January 14, 2000 without just cause while she was on leave. She was notified by a letter signed by Mr. Joint. Mr. Joint was not terminated or disciplined in any way;
 f. The respondents discriminated against the complainant with respect to terms and conditions of employment and termination because of her sex."
(Commission Memorandum at Ex. B.) Joint denied the allegations, and a hearing date was scheduled for September 22, 2003.
On April 2, 2003, DeMarkey served Joint with her Request for Production, seeking relevant documents and documents that he intended to rely on at the hearing. Joint failed to reply to the request and, on July 17, 2003, DeMarkey filed a Motion to Compel asking the Commission to order him to immediately respond. The Commission gave Joint until August 1, 2003 to file an objection and, after not having done so, on August 12, 2003, ordered Joint to respond to the Request for Production within ten days. In a letter dated August 16, 2003 and received by the Commission on August 25, 2003, Joint explained:
 "In regards to the request for production, as you know all records pertaining to anyone previously employed with [Island Mortgage] are very difficult to procure as they are presently non-operational and under bankruptcy protection. I am presently trying to locate any archived information that I may have access to, and I will forward anything of relevance as soon as it becomes available. This was stated as an objection previously, and I am noting it for the record in this response."
(Commission Memorandum at Ex. D.) Thereafter, although the hearing was postponed from September 22, 2003 to November 21, 2003, Joint did not produce any of the documents until the day of the hearing stating that "[the documents] became available yesterday. I had to pull them. I had to find anything that I could possibly find." (Hearing Tr. at 79.) He further explained, "I have Right Track documents I've had to dig up, and I've just made copies today, so they weren't available." Id.
Joint proceeded pro se at the hearing, and testimony was elicited from both him and DeMarkey. Demarkey testified that prior to the summer of 1998, she was earning approximately $22,000 per year as a loan officer for Right Track Financial, a mortgage brokerage company, in Manchester, Connecticut. (Hearing Tr. at 8-9.) She stated that she first met Joint — a supervisor in the company's Rhode Island office — following a company meeting in Connecticut in the office parking lot. Id. at 10-11. Demarkey recalled that during their initial discussion, Joint gave her advice on how to structure a particular loan. Id. at 11. DeMarkey testified that her relationship with Joint progressed through phone conversations and that, eventually, Joint mentioned the possibility of her moving to Rhode Island to work in his office. Id. at 12. DeMarkey admitted that she had become attracted to Joint and that their relationship extended beyond business into discussions of his failing marriage. Id.
at 15.
In November of 1998 DeMarkey was offered, and she accepted, a position in Right Track's Rhode Island office as a production manager. Id. She stated that she took the position because she expected to earn upwards of $100,000 per year in commission "[b]ased on what Mr. Joint had told [her], based on the structure of the office, based on Mr. Joint providing leads." Id. at 16. In addition, DeMarkey testified that she was persuaded to move to Rhode Island because of her developing relationship with the plaintiff. She described how they "talked about having children" prior to her move and how, once she moved to Rhode Island, they "were together almost every night having dinner." Id. at 17. Furthermore, she stated that she became "much closer" with Joint after her move to Rhode Island and that a physical relationship developed. Id. at 21. Demarkey testified that she and Joint would kiss often and that she performed oral sex on him approximately ten times. Id. at 22. She admitted that she was not coerced into doing anything with Joint. Id. at 23.
DeMarkey also explained the intricacies of the how the Rhode Island office would function on a daily basis. She stated:
 "Mr. Joint would provide us with leads and we would call these people, everything was done over the telephone. We'd fax the mortgage application to them with an authorization for a credit report. They'd fax it back to us. We'd do calculations, figured out what they needed, and then a mortgage package would be overnighted to the person's home or business."
(Hearing Tr. at 20.) DeMarkey noted that the leads she was given from Joint constituted the only source from which she was able to make client contacts. Id. She acknowledged that she was doing much better financially in the Rhode Island office than she had been doing in Connecticut and that she was earning between $1,500 and $3,000 per month. Id. at 23, 25. Despite her relative success, the Rhode Island Right Track office closed in May of 1999. Id. at 26.
DeMarkey testified that she remained unemployed the following summer and that she was assured by Joint that he would find her a position. Id. at 28. In addition, she stated that although they had no face-to-face contact during her unemployment, Joint assisted her with rent payments. Id. DeMarkey believed the rent payments made by Joint to be loans. Id. at 29. According to DeMarkey, she and Joint eventually decided to establish a Rhode Island branch of Island Mortgage Network, a company based in New York. Id. at 30-32. She acknowledged that Joint was "definitely in charge" and testified that she "interviewed loan officers, mortgage processors, [and] underwriters" in helping to set up the business. Id. at 31-32.
DeMarkey detailed a specific occasion when she set up a meeting among herself, Joint, and a real estate attorney with whom she was friendly, at Foxwoods Casino in order to discuss the possibility of the attorney doing closings for the new office.Id. at 32-33. In the following exchange with counsel, DeMarkey explained how the ride home from Foxwoods that evening marked the end of her intimate relationship with Joint:
 "Q. During this trip to Foxwoods, did you have any discussions with Mr. Joint regarding your relationship, your personal romantic relationship?
 A. Yes. Things had been very strained between the two of us. We had been arguing a lot.
 Q. Was Mr. Joint still with his wife?
 A. Yes. After we had had dinner, we had headed to the casino, and I was still very angry with him, and he told me that, he says, "You know I love you to death, don't you?"
 Q. Why were you angry with Mr. Joint? What was the cause of your frustration or aggravation?
 A. He was sending me mixed signals about our personal relationship.
 Q. How so?
 A. He was running hot and cold. One minute he was going to be leaving his wife and wanted to be with me. We were discussing the affect it would have on his children. And then the next minute, you know, I'd get the cold shoulder. So it was an emotional roller coaster.
 Q. And that basically was occurring during this trip to Foxwoods as hot and cold to use your words?
 A. Yes.
 Q. How did that trip conclude or did anything happen, any event happen during that trip that stands out?
 A. Yes. He told me that on the way home, because I wanted to know what his intentions were.
 Q. You were driving home with Mr. Joint?
 A. Yes.
 Q. And it's just the two of you at that time?
 A. Yes. We had met Attorney Silver at the casino. He told me that he didn't have any intentions of leaving his wife. When we were driving on 95, Mr. Joint pulled into the scenic overlook by Exit 90 in Mystic so we could talk.
 Q. You had a conversation with him?
 A. Yes. And then he touched my breasts and we started kissing, and I ended up performing oral sex on Mr. Joint. He was all flustered after that. He drove me back to the commuter parking lot where I had left my car, and he was very angry.
 Q. Why was he angry? Did you confront him about any issue during this drive?
 A. I did. I wanted to know what his intentions were; if he was going to leave his wife, if he wasn't going to leave his wife. And he just got angry and he said, he says, "I'm not leaving my wife. If you can't deal with that," he said, "I'll give you a pink slip right now."
 . . .
 Q. So we're clear, when you pressed him whether he was going to leave his wife, Mr. Joint became angry?
 A. Yes.
 . . .
 Q. Was that you putting an end to the romantic contact or was it mutual, how would you describe it? Could it be put on someone or the other?
 A. I would say that it was mutual, but I had lost respect for him."
(Hearing Tr. at 34-36, 38.) Later, DeMarkey acknowledged that she understood "the relationship wasn't going any further" after the incident. Id. at 96.
According to DeMarkey, after her intimate relationship with Joint had ended, he became "frosty" towards her, and he drastically altered her work conditions at Island Mortgage. Id.
at 37. She stated that she virtually stopped getting leads from Joint, that she was asked to go beyond her job description and to train new employees, and that she was isolated and treated with indifference while other loan officers were being kept busy with work. Id. at 40-41. DeMarkey testified that the treatment at work made her feel lonely and depressed. Id. at 43. She also recounted that, on November 1, 1999, Joint met with Attorney Silver at Foxwoods a second time, but she was not asked to attend. Id. at 45. Instead, the employee she trained — who she described as unqualified — accompanied Joint to the meeting.Id. at 42, 45. DeMarkey testified that the incident caused a "light bulb" to go off and that she "became so overwhelmed with the realization that [the] whole year not only had been a waste of my time, but a big lie." Id. at 44. She stated that, as a result, she had a mental breakdown and tried to commit suicide.Id. at 45.
DeMarkey testified that she returned to Connecticut and began an outpatient program at the Institute of Living on November 19, 1999, where she received treatment by a psychiatrist. Id. at 48. She stated that she notified Island Mortgage that she was not going to be returning to work because of her condition. Id.
DeMarkey testified that she faxed doctors' notes to the Island Mortgage Human Resources Department in New York, and to her Rhode Island office, informing the company of her doctors' recommendations that she take a medical leave of absence extending through January. Id. at 49, 55. She recalled that she received a termination letter from Joint either January 3rd or 4th of 2000. Id. at 56. The letter was sent to DeMarkey's mother's home and cited DeMarkey's "sales performance and [Island Mortgage's] increased work load" as reasons for her dismissal. (Hearing Ex. 4.) Furthermore, the letter noted that "[m]any attempts have been made to contact you or your assigns via phone, pager, voice mail, etc., but have been unsuccessful to date."Id.
DeMarkey mentioned that since her termination, although she has been unable to continue doing financial work, she has held a number of part-time positions for short periods of time and, additionally, has taken classes at a community college. (Hearing Tr. at 65.) She noted that she worked as a waitress, but found that it was "too stressful," and that she has worked at a dry cleaning business and a Laundromat. Id. Finally, DeMarkey testified that she accumulated medical bills totaling approximately $22,095.11 as a result of her experience at Island Mortgage. Id. at 61.
Joint's testimony was primarily elicited through a statement made in lieu of direct testimony due to his status as a pro se litigant. Joint testified that he hired DeMarkey because he wanted to help her. (Hearing Tr. at 113.) He said that he "went above and beyond" for her as he does with a lot of employees.Id. Joint denied having a relationship with DeMarkey and stated that he never discussed having children with her. Id. at 117. Furthermore, with regard to her work performance, Joint testified that "Durrelle had a problem working with people" and that she "had a big performance issue . . . because she was not showing up [to work]." Id. at 117, 119. Joint stated that he fired DeMarkey over the phone because she called Attorney Silver while he and Mr. Silver were having a meeting — a meeting that Joint did not want her to attend — at Foxwoods. Id. at 122. Lastly, Joint acknowledged he knew DeMarkey was in treatment but said that he "thought there was some gamesmanship going on" and explained that he believed she was somehow attempting to circumvent, or nullify, her termination by undergoing treatment and claiming that she could not be fired because of it. Id. at 126-27. Joint testified that he sent her the termination letter to clarify her employment status. Id. at 127.
On October 12, 2004, the hearing officer rendered a written decision in the matter. The hearing officer's findings of fact included the following: (1) "Mr. Joint stated that he was not going to leave his wife and that if the complainant could not deal with that, he would give her a "`pink slip'"; and (2) "After this occasion, the complainant and Mr. Joint no longer had a sexual relationship. Mr. Joint treated the complainant differently than he had before and treated her differently from other staff members." (Commission Decision at 3.) Joint's testimony, especially regarding his reasons for terminating Demarkey, was not found to be credible. Id. at 10. The hearing officer concluded that Joint "discriminated against the complainant with respect to terms and conditions of employment and termination of employment because of her sex." Id. at 7. The hearing officer explained, "[DeMarkey's] refusal to continue the affair with Mr. Joint led him to decrease the leads he gave her" and, further, that Joint "used his power as supervisor to make the complainant's working conditions more onerous because she no longer had sexual relations with him." Id. at 8. As a result, Joint was ordered to pay DeMarkey back pay of $2,250 per month from Novermber 1, 1999 to the date of Island Mortgage's dissolution, $75,000 in compensatory damages for pain, suffering and impairment of ability to work, and $17,794.58 as past pecuniary compensatory damages for her medical treatment. Id.
at 15. In addition, Joint was ordered to undergo sex discrimination and sexual harassment training. Id. at 14.
Joint filed a Motion for Rehearing following the issuance of the Commission's decision. The motion was subsequently denied on January 18, 2005. Thereafter, on January 27, 2005, Joint filed a timely appeal of the Commission's decision with the Superior Court pursuant to G.L. 1956 § 42-35-15. On appeal, Joint argues that the Commission's decision should be overturned because (1) the Commission lacked jurisdiction to hear the matter, (2) the Commission improperly failed to notify him regarding the nature of the charges against him, (3) the record was devoid of any evidence indicating that he conditioned DeMarkey's employment on the receipt of sexual favors, (4) the hearing officer abused her discretion by denying him the opportunity to introduce evidence regarding his legitimate, non-discriminatory reasons for DeMarkey's termination, and (5) there was a lack of evidence to justify the Commission's award of damages. In response, DeMarkey and the Commission maintain that Joint waived his jurisdictional argument, that he was properly notified of the charges levied against him, and that the decision and hearing were sound in all respects and, therefore, should be upheld.
 Standard of Review
This Court's review of an administrative decision is governed by the mandates of the Administrative Procedures Act. Section42-35-15(g) of the Act provides:
 "The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings, or it may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
 (1) In violation of constitutional or statutory provisions;
 (2) In excess of the statutory authority of the agency;
 (3) Made upon unlawful procedure;
 (4) Affected by other error of law;
 (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion."
In reviewing an administrative agency's decision, this Court is limited to an examination of the certified record to determine whether said decision is supported by substantial evidence. Ctr.for Behavioral Health, Rhode Island, Inc. v. Barros,710 A.2d 680, 684 (R.I. 1998) (citations omitted). Substantial evidence has been defined as "such relevant evidence that a reasonable mind might accept as adequate to support a conclusion, and means an amount more than a scintilla but less than a preponderance."Newport Shipyard, Inc. v. Rhode Island Comm'n for Human Rights,484 A.2d 893, 897 (R.I. 1996). This Court "shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact." Ctr. for Behavioral Health,710 A.2d at 684 (citations omitted). Only where "factual conclusions of administrative agencies . . . are totally devoid of competent evidentiary support in the record" may the Superior Court reverse. Baker v. Dep't of Employment and Training Bd. ofReview, 637 A.2d 360, 363 (R.I. 1994) (quoting Milardo v.Coastal Res. Mgmt. Council, 434 A.2d 266, 272 (R.I. 1981)).
 The Commission's Jurisdiction
As a threshold matter, Joint argues that the Commission's decision should be overturned because the proceedings were held in violation of a statutory provision. Specifically, Joint asserts that the Commission lacked jurisdiction to hear the matter under G.L. 1956 § 28-5-17 because DeMarkey did not file her charge until beyond the one-year statutory limit. Joint maintains that the Commission hearing was held in violation of the statute because DeMarkey did not file a charge with the Commission until January 11, 2001 and, according to her testimony, she had received the termination letter on either January 3 or January 4 of 2000. In response, the Commission claims that the issue of timeliness was never raised at or before the hearing and, therefore, has been waived.
Section 28-5-17 states:
 "(a) Upon the commission's own initiative or whenever an aggrieved individual or an organization chartered for the purpose of combating discrimination, racism, or of safeguarding civil liberties, or of promoting full, free, or equal employment opportunities, that individual or organization being subsequently referred to as the complainant, makes a charge to the commission that any employer, employment agency, labor organization, or person, subsequently referred to as the respondent, has engaged or is engaging in unlawful employment practices and that the unlawful employment practices have occurred, have terminated, or have been applied to affect adversely the person aggrieved, whichever is later, within one year, the commission may initiate a preliminary investigation."
Despite Joint's suggestion that the one year requirement is jurisdictional in nature and, as a result, cannot be waived, prior case law dictates that the requirement can be waived as it is akin to a statute of limitations.
As a general rule, the failure to plead the statute of limitations as an affirmative defense results in a waiver of the defense. La Bounty v. La Bounty, 497 A.2d 302, 305 (R.I. 1985);see Super. R. Civ. P. 8(c). In the case at hand, the particular one year limitation period at issue, set forth in § 28-5-17, has been characterized as a "statute of limitations" requirement on multiple occasions. See Rathbun v. Autozone, Inc.,253 F. Supp. 2d 226, 231-32 (D.R.I. 2003), aff'd, 361 F.3d 62 (1st Cir. 2004); Kriegel v. Rhode Island, 266 F. Supp. 2d 288, 294-95
(D.R.I. 2003). However, an appeal from an administrative agency is a civil proceeding, not a civil action. See Carbone v.Planning Bd. of Appeal, 702 A.2d 386, 388 (R.I. 1997). Nevertheless, in dealing with similar issues in the context of federal employment discrimination laws, which the Rhode Island Supreme Court has historically used as a model for its employment discrimination jurisprudence, see DeCamp v. Dollar TreeStores, Inc., 875 A.2d 13, 21 (R.I. 2005), the United States Supreme Court has stated that "filing a timely charge of discrimination with the [Equal Employment Opportunity Commission] is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver[.]" Zipes v. Trans World Airlines, Inc.,455 U.S. 385, 393 (1982).
Here, although Joint disputed the date on which DeMarkey was terminated, he never explicitly or impliedly raised the issue of timeliness with regard to her filing of the charge. In actuality, the only conclusion that can be reached from the testimony is that Joint, by urging the November 1, 1999 date, was simply attempting to establish when, and why, he fired Demarkey. Because the one year time limit in § 28-5-17 constitutes a statute of limitation, his failure to raise the issue until after the hearing amounts to an effective waiver. Furthermore, it should be noted, pursuant to G.L. 1956 § 28-5-30, "[a]n objection that has not been urged before the commission, its member, or agent shall not be considered by the court, unless the failure or neglect to urge the objection is excused because of extraordinary circumstances." The absence of any extraordinary circumstances surrounding Joint's failure to raise the timeliness issue further demands a finding that he has waived his right to the affirmative defense. Accordingly, the decision of the Commission was not affected by error of law or an abuse of discretion.
 Notice of the Charges
Joint also claims that the Commission's proceedings were "severely defective in that the Commission failed to place [him] on notice of the precise nature of the charges against him." (Pl.'s Memorandum at 11.) Joint argues that the allegations in the complaint failed to put him on notice of the general nature of DeMarkey's grievance and that said allegations were so divergent from the facts presented at the hearing he was effectively deprived of his right to notice altogether. Conversely, the Commission maintains that the charge and complaint both set forth allegations sufficient to meet the notice requirements of G.L. 1956 § 42-35-9. Furthermore, the Commission asserts that Joint waived his right to argue deficient notice because he failed to previously raise the issue and that he was not prejudiced by lack of notice because he was entitled to conduct discovery and simply failed to do so.
General Laws 1956 § 42-35-9 sets forth the notice standards for administrative proceedings:
 "(a) In any contested case, all parties shall be afforded an opportunity for hearing after reasonable notice.
 (b) The notice shall include:
 (1) A statement of the time, place, and nature of the hearing;
 (2) A statement of the legal authority and jurisdiction under which the hearing is to be held;
 (3) A reference to the particular sections of the statutes and rules involved;
 (4) A short and plain statement of the matters inserted. If the agency or other party is unable to state the matters in detail at the time the notice is served, the initial notice may be limited to a statement of the issues involved and detailed statement shall be furnished."
This statute is "intended to assure that a party is apprised of the nature of the hearing so that he can adequately prepare."Correia v. Norberg, 120 R.I. 793, 801, 391 A.2d 94, 98 (1978). "These provisions make clear that a party to a contested case shall receive notice which in plain terms draws attention to, among other things, the subject matter to be considered at the hearing." Providence Gas Co. v. Burke, 119 R.I. 487, 503,380 A.2d 1334, 1342 (1977).
Again, considering the extent to which our Supreme Court has viewed federal jurisprudence as instructive in employment discrimination matters, this Court notes the United States Supreme Court's position regarding the pleading standard for such cases. In Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512
(2002), the Court emphasized its preference for liberal pleading standards in explaining, "the prima facie case operates as a flexible evidentiary standard, it should not be transposed into a rigid pleading standard for discrimination cases." The Court continued, "[t]his simplified notice pleading standard relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims." Id. (citing Conley v. Gibson, 355 U.S. 41, 47-48
(1957); Leatherman v. Tarrant County Narcotics Intelligence andCoordination Unit, 507 U.S. 163, 168-169 (1993)). The Court also noted that the risk of surprise in improper pleading is very low, despite the relaxed pleading requirements, due to flexible discovery provisions and effective pretrial procedures. Id. at 512-13. Finally, the Supreme Court defined sufficient notice — in a manner similar to our Supreme Court — as "fair notice of what the plaintiff's claim is and the grounds upon which it rests."Id. at 512 (quoting Conley, 355 U.S. at 47).
In the instant matter, prior to his November 21, 2003 hearing, Joint was served the Commission's "Notice of Hearing" to which the Complaint was attached. In addition to setting forth the time and place of the hearing, the Complaint cited G.L. 1956 § 28-5-7
as the governing statute and stated that "[t]he charge alleged that the respondents discriminated against the complainant with respect to terms and conditions of employment and termination because of her sex[.]" (Hearing Ex. 1.) Furthermore, the Complaint listed allegations that the Preliminary Investigating Commissioner found probable cause to believe, including (1) that "[t]he complainant had a sexual relationship with her supervisor Timothy Joint;" (2) that "[t]he complainant went on medical leave as a result of the disintegration of her relationship with Mr. Joint"; and (3) that the "respondents terminated the complainant on January 14, 2000 without just cause while she was on leave . . . by a letter signed by Mr. Joint[.]" Id.
Given that the purpose of providing notice is to apprise people of the nature of the hearing and to draw attention to the subject matter to be considered there as well, this Court finds that Joint received effective notice from the Commission. Here, the Complaint fulfilled its duty to notify Joint of the nature and subject matter of the hearing by stating that Joint was being accused of sexual discrimination and by citing an alleged sexual relationship with DeMarkey that eventually resulted in her termination. As the Supreme Court noted in Swierkiewicz, it is not necessary to plead specific facts constituting a prima facie case of employment discrimination because discovery affords the parties with an opportunity to recognize and define disputed issues of fact. Ultimately, the allegations memorialized in the Complaint amounted to sufficient notice of the nature of the charges imposed against Joint. See Price v. State of RhodeIsland, 500 A.2d 527, 529 (R.I. 1985) (finding that the plaintiff received sufficient notice of an administrative hearing); see also Correia, 120 R.I. at 810-02,391 A.2d at 98. Accordingly, the decision of the Commission regarding such notice was not in violation of constitutional provisions.
 The Discrimination Finding
The Commission ruled that Joint discriminated against DeMarkey with respect to the terms and conditions of her employment and her termination. On appeal, Joint argues that the Commission's decision was clearly erroneous in view of the reliable, probative, and substantial evidence in the record. Specifically, he claims that the hearing was completely devoid of evidence to support the Commission's determination that Joint discriminated against DeMarkey because "she would no longer have sexual relations with him." (Commission Decision at 10.) In response, the Commission maintains that there was evidence from which it rightfully concluded Joint engaged in sexual discrimination. The Commission emphasizes its disbelief of Joint's testimony, including his asserted justification for DeMarkey's termination, in arguing in support of its findings.
In employment discrimination jurisprudence the term, "sex discrimination," can refer to either discrimination based on sexuality or discrimination based on gender. See 3 LarsonEmployment Discrimination § 46.01[3] at 46-7 (2nd ed. 2006). In general, sex discrimination based on sexuality is termed "sexual harassment" and refers to the situation where an employee is fired for refusing, or faces an adverse employment action because he or she has refused, sexual advances. Id. On the other hand, discrimination based on gender, or "gender harassment," encompasses "differential treatment based on one's gender; indeed, it is an exact counterpart to racial harassment[.]" Id.
Because of this distinction, and the Commission's seeming reliance on both theories in finding Joint liable, it is necessary to consider the underlying decision and the evidence through both frameworks.
A. Sexual Harassment
Section 3001(a) of the Rhode Island Commission for Human Rights Guidelines ("the Guidelines") on Sexual Harassment provides:
 "Harassment on the basis of sex is a violation of the Fair Employment Practices Act. Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual[.]"
See 94 040 CRIR 007-2. The Commission followed the above mandate in reaching its decision in the case at hand. With regard to its finding that Joint discriminated against DeMarkey with respect to the terms and conditions of her employment, the Commission explained "Mr. Joint used his power as supervisor to make the complainant's working conditions more onerous because she no longer had sexual relations with him." (Commission Decision at 8.) Furthermore, despite the Commission's application of the gender discrimination burden shifting test in finding that Joint discriminated against DeMarkey with respect to her termination, the Commission's conclusion, that "Mr. Joint discriminated against the complainant with respect to . . . termination of employment because she would no longer have sexual relations with him," indicates that the Commission's determination was founded upon a sexual harassment analysis.
In considering claims brought under § 28-5-7, the Rhode Island Supreme Court has looked to decisions of the federal courts, in construing Title VII of the Civil Rights Act of 1964, for guidance. See DeCamp v. Dollar Tree Stores, Inc.,875 A.2d 13, 21 (R.I. 2005); see also Newport Shipyard, Inc. v. RhodeIsland Comm'n for Human Rights, 484 A.2d 893, 897-98 (R.I. 1984); Narragansett Electric Co. v. Rhode Island Comm'n forHuman Rights, 118 R.I. 457, 374 A.2d 1022 (1977). Although it has not been specifically acknowledged by our Supreme Court, the Commission in this matter applied the "quid pro quo" harassment standard, a standard well recognized in federal courts, including the First Circuit. See Burlington Indus., Inc. v. Ellerth,524 U.S. 742 (1998); Hernandez-Loring v. UniversidadMetropolitana, 233 F.3d 49, 52 (1st Cir. 2000). Quid pro quo harassment has been described as a subset of disparate treatment harassment as it refers to a particularized type of disparate treatment in the work place. See Smering v. FMC Corp., No. 01-CV-721S, 2004 U.S. Dist. LEXIS 19924, at *35 (W.D.N.Y. Sept. 24, 2004) ("disparate treatment claims encompass quid pro quo acts"); see also Alfano v. Costello, 294 F.3d 365, 373 (2nd Cir. 2002); Collins v. Baptist Memorial Geriatric Center,937 F.2d 190, 196 (5th Cir. 1991).
Similar to the standard set forth by section 3001(a) of the Guidelines, "[u]nder Title VII, quid pro quo sexual harassment can be shown where a supervisor uses employer processes to punish a subordinate for refusing to comply with sexual demands."Hernandez-Loring, 233 F.3d at 52 (citing Wills v. BrownUniv., 184 F.3d 20, 25 (1st Cir. 1999); Lipsett v. Universityof Puerto Rico, 864 F.2d 881, 897 (1st Cir. 1988)). Many courts apply a five-part test to analyze the strength of a quid pro quo sexual harassment claim. Bryson v. Chicago State Univ.,96 F.3d 912, 915 (7th Cir. 1996) (citing, Chamberlin v. 101 Realty,Inc., 915 F.2d 777, 783 (1st Cir. 1990); Spencer v. GeneralElectric Co., 894 F.2d 651, 658 (4th Cir. 1990); Highlander v.K.F.C. National Management Co., 805 F.2d 644, 649 (6th Cir. 1986); Jones v. Flagship International, 793 F.2d 714, 721-22
(5th Cir. 1986); Henson v. City of Dundee, 682 F.2d 897, 903-05
(11th Cir. 1982)). Using such an approach, the courts ask "whether the plaintiff has shown (1) that she or he is a member of a protected group, (2) the sexual advances were unwelcome, (3) the harassment was sexually motivated, (4) the employee's reaction to the supervisor's advances affected a tangible aspect of her employment, and (5) respondeat superior has been established." Id. Element (3) is of particular importance in the instant matter as it pertains to the crux of Joint's appeal by asking "whether the harasser was looking for sexual favors or something else." Id.
After a thorough review of the record, this Court finds that the Commission erred in holding Joint liable for sexual harassment because there was no evidence presented at the hearing indicating that he requested sexual favors from DeMarkey or that the sexual advances were unwelcome. By DeMarkey's own admission, the two were engaged in a consensual sexual relationship that was ended by what she described as a "mutual" decision of the parties. (Tr. at 38.) Furthermore, she acknowledged that Joint's "pink slip" threat was elicited by her pressuring him to leave his wife. Based on DeMarkey's characterization of the events, the only conclusion that can be reached is that their relationship disintegrated because Joint refused to leave his wife. Although Joint's pink slip comment was both ill-advised and unprofessional, viewing it in context — as described by DeMarkey — it was by no means an attempt by Joint to condition her employment on her compliance with any sexual favors. To the contrary, the sequence of events indicate that Joint was attempting to distance himself from DeMarkey because he decided that he would rather remain with his wife than continue a relationship with his co-worker. Moreover, at no point did DeMarkey suggest that she understood his comment, or any communication thereafter, to constitute a request for a sexual favor. Ultimately, the Commission's conclusion, regarding Joint's request for sexual favors, was clearly erroneous in view of the reliable, probative and substantial evidence in the record and was affected by error of law.
B. Gender Discrimination
Although it is evident from the record that DeMarkey does not have a viable claim of quid pro quo harassment, it is still necessary to review the Commission's decision in terms of whether there was sufficient evidence to find Joint liable under the gender discrimination framework. Gender discrimination, or "gender harassment," typically "involves conduct rooted in animosity toward people" of a particular gender. 3 LarsonEmployment Discrimination § 46.01[3] at 46-7 (2nd ed. 2006). "[T]he harassing conduct need not be sexual in nature, but rather need only have occurred because of the employee's gender." Id.,
§ 46.01[3] at 46-36.
A gender-based disparate treatment claim follows the three-step burden shifting framework set forth in McDonnell Douglas Corp.v. Green, 411 U.S. 792 (1973). DeCamp v. Dollar Tree Stores,Inc., 875 A.2d 13, 21 (citing Casey v. Town of Portsmouth,861 A.2d 1032, 1036-37 (R.I. 2004); Ctr. for Behavioral Health,Rhode Island, Inc. v. Barros, 710 A.2d 680, 685 (R.I. 1998)). Under this framework, the complainant must first establish the following to state a prima facie case:
 "(1) she is a member of a protected class; (2) she was performing her job at a level that rules out the possibility that she was fired for inadequate job performance; (3) she suffered an adverse job action by her employer; and (4) her employer sought a replacement for her with roughly equivalent qualifications."
DeCamp, 875 A.2d at 21 (quoting Smith v. Stratus Computer,Inc., 40 F.3d 11, 15 (1st Cir. 1994)). "The burden of proving a prima facie case `is not especially onerous.'" Id. (citing and quoting Barros, 710 A.2d at 685). The next step in the analysis requires an employer to offer a legitimate, nondiscriminatory reason for taking the adverse employment action. Id. Lastly, the third step "requires the employee to convince the fact-finder that the legitimate, nondiscriminatory reason was pretext for unlawful discriminatory animus." Id. at 21-22 (citing Casey,861 A.2d at 1037-38). Proving discriminatory animus does not require a "smoking gun" but, rather, can be demonstrated through a combination of the complainant's prima facie case and sufficient evidence to find that the employer's asserted justification is false. See Casey, 861 A.2d at 1038 (citingReeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 148
(2000).
In the underlying decision, the Commission found that DeMarkey presented evidence sufficient to meet the requirements of a prima facie case of gender discrimination. (Commission Decision at 9.) Additionally, the Commission acknowledged that Joint offered evidence, through his testimony, that he terminated DeMarkey for insubordination and improper conduct. Id. Therefore, it was DeMarkey's burden to convince the hearing officer that Joint's reasons were pretext for unlawful discriminatory animus. The question of whether DeMarkey presented any evidence of unlawful discriminatory animus is now before this Court.
Under similar circumstances, a number of courts have expressed the opinion that negative or less favorable treatment of a subordinate by a supervisor, following the end of a romantic relationship, does not constitute evidence of gender discrimination. In Huebschen v. Dept. of Health and SocialServices, 716 F.2d 1167, 1169, 1171 (7th Cir. 1983), a case in which the court used the Equal Protection clause of the United States Constitution as the basis for the employee's sex discrimination claim, a female supervisor engaged in a romantic relationship with a male subordinate. Eventually, their relationship became more "up and down" and disintegrated to the point where the supervisor was unfriendly and even attempted to avoid the other employee on occasion. Id. at 1169. After enduring a sexually derogatory comment from the supervisor, the subordinate employee demanded that the "sexual stuff" stop and stated that he wanted them to be friends. Id. Subsequently, the supervisor recommended that the subordinate — who had been promoted on a probationary basis and, therefore, could only be either permanently promoted or fired — be terminated. Id.
In reviewing the facts of the case, the court noted:
 "[t]here was no testimony that [the supervisor] ever told [the subordinate] that if he did not comply with her sexual requests or have an affair with her he would receive an unfavorable recommendation. [The subordinate] did testify, however, that soon after [he received notice of his termination she] called to warn him that if he ever discussed the true circumstances of his demotion she would make sure that he lost all of his friends and that everyone knew that he was a chronic liar."
Id. Thereafter, the court stated that it was not convinced that "[the supervisor] discriminated against [the subordinate] as a man rather than merely an individual" and that "the evidence . . . establish[ed] that [the subordinate's] gender was merely coincidental to [the supervisor's] action." Id. at 1172. In concluding that the facts did not amount to a claim of sexual discrimination, the court explained,
 "[w]hen the consensual romance between [the parties] ended . . . [the supervisor] did indeed react spitefully towards [the subordinate] by recommending that he be demoted at the end of the probationary period. But [the supervisor's] motivation in doing so was not that [the subordinate] was male, but that he was a former lover who had jilted her."
Id.
In another, more recent decision, Meeker v. Vitt, No. 1:04cv1318, 2006 U.S. Dist. LEXIS 15009 (N.D. Ohio Mar. 31, 2006), the court similarly declined to hold the defendant liable for gender discrimination under facts analogous to the case at hand. The defendant in Meeker, Mr. Vitt, was the president of a real estate development and construction firm for which the plaintiff, Ms. Meeker, worked intermittently for approximately two years. Id. at *2. The parties had a brief, unsuccessful engagement, years prior to Ms. Meeker's joining Mr. Vitt's company as an employee. Id. at *2-*3. When Ms. Meeker began working for Mr. Vitt, he allegedly asked her to marry him again but she declined. Id. at *3. Thereafter, during a period of time while Ms. Meeker was not employed by Mr. Vitt, the two went on a number of trips together to destinations such as Naples, Florida, and Telluride, Colorado. Id. at *4. The parties disputed whether the purpose of their travels was business or pleasure. Id. Eventually, after Ms. Meeker returned to work for Mr. Vitt, "[he] said he needed to terminate her because `he needed to take care of himself, and that the best thing to do was for him to get on with his life and not have any, that it would be best if here didn't see me [Meeker] at work.'" Id. at *6 (quoting Meeker's Dep. May 18, 2004 at 95.) The court further noted: "Meeker admits Vitt never directly or indirectly asked her to have sex while she worked for [him]. She testified the alleged discrimination did not prevent her from doing her job, but made her miserable." Id.
In conclusion, the court found that "[a]nimosity towards an employee that stems from a `prior failed romantic relationship' or the `desire to rekindle' a past relationship is not discrimination based on sex." Id. at *22. Moreover, the court explained, "[e]ven firing an employee to end a romantic relationship does not demonstrate gender animosity." Id.
(citing Kahn v. Objective Solutions, Intl., 86 F. Supp. 2d 377,382 (S.D.N.Y. 2000)). Ultimately, it was determined that the "evidence at best shows Vitt fired Meeker because he wanted to end their personal relationship" and, additionally, that it "did not show Vitt fired Meeker because she would not engage in a sexual relationship with him." Id. at 23. Various other courts have reached similar conclusions regarding the effect of a prior consensual sexual relationship on a claim for sex/gender discrimination. See Kahn, 86 F. Supp. 2d at 382 ("[p]articipation in a consensual office affair does not constitute actionable gender discrimination when the termination of the affair results in discharge. It may constitute unfair and certainly unchivalrous behavior, but not discrimination because of gender"); Mauro v.Orville, 697 N.Y.S.2d 704, 707 (N.Y.App.Div. 1999) ("[a]lthough surely antithetical to good business practices, discrimination against an employee on the basis of a failed voluntary sexual relationship does not of itself constitute discrimination because of sex"); Keppler v. Hinsdale TownshipHigh School, 715 F. Supp. 862, 869 (N.D. Ill. 1989) (following a failed romantic relationship "[f]eelings will be hurt, egos damaged or bruised. The consequences are the result not of sexual discrimination, but of responses to an individual because of her former intimate place in her employer's life"); see also Mosherv. Dollar Tree Stores, Inc., 240 F.3d 662 (7th Cir. 2001) (summary judgment granted in favor of defendant in sex discrimination claim where sexual relationship had gone "sour").
DeMarkey suggests that this Court follow the reasoning of the Fifth Circuit as expressed in Green v. The Administrators of theTulane Educational Fund, 284 F.3d 642 (5th Cir. 2002). There, the court upheld a jury verdict finding the defendant liable for sex discrimination because the testimony allowed the jury to infer that the defendant harassed the plaintiff "because she refused to continue to have a casual sexual relationship." Id.
at 657. At trial, the complainant had presented evidence indicating that she chose to end the relationship with the defendant and he retaliated by harassing her. Id. The instant matter is distinguishable as the evidence does not present the slightest indication that DeMarkey unilaterally chose to end the relationship. She testified before the hearing officer that the decision to end her relationship with Joint was "mutual." Furthermore, DeMarkey's acknowledgment — that she "pressured" Joint to leave his wife — suggests that he chose to end the relationship rather than succumb to her request.
The record contains no probative evidence that Joint treated DeMarkey with hostility because of her gender. Again, as she testified, the decision to end their relationship was mutual. In fact, prior to the end of their relationship, he was, at the very least, accommodating to her by assisting her in finding housing, helping her secure employment, and providing her with leads. When Joint stopped treating DeMarkey favorably, it was not because he suddenly came to the realization that she is a woman; it was because he harbored animosity towards her as an individual. There was no evidence from which the Commission could deduce that Joint was motivated by an unlawful discriminatory animus towards women throughout his communications with DeMarkey. Additionally, it should be noted, the evidence submitted regarding his alleged harassing behavior — failing to supply her with leads, asking her to make "cold calls," and asking her to train a new employee — did not contain a sexual element. As in Huebschen, Meeker, and a number of other cases cited above, here, the complete lack of evidence of sex discrimination requires this Court to find that Joint did not discriminate against DeMarkey "because of . . . sex." Therefore, this Court finds that the Commission's decision holding Joint liable for sex discrimination was not supported by the reliable, probative, and substantial evidence and was affected by error of law. As a result, it is not necessary to consider the remainder of Joint's arguments.
 Conclusion
After reviewing the entire record, this Court finds that the Commission's decision was clearly erroneous in view of the reliable, probative, and substantial evidence and was affected by error of law. The facts as presented to the Commission did not permit an inference of sexual discrimination as there was no probative evidence that Joint either conditioned DeMarkey's employment on the receipt of sexual favors or that he treated her unfavorably because of an unlawful discriminatory animus. Substantial rights of the plaintiff were prejudiced. Accordingly, the Commission's decision, holding Joint liable for sexual discrimination, is reversed. The parties shall submit judgment in conformity with this decision.